UNITED STATES of America, Plaintiff-Appellee,

v.

George Raymond DIPP, Defendant-Appellant.

No. 77–2730.

United States Court of Appeals, Ninth Circuit.

July 31, 1978.

Rehearing and Rehearing En Banc Denied Sept. 19, 1978.

Harry E. Claiborne, Las Vegas, Nev., for defendant-appellant.

Raymond D. Pike, Asst. U. S. Atty., Reno, Nev., for plaintiff-appellee.

Before HUFSTEDLER, SNEED and KENNEDY, Circuit Judges.

SNEED, Circuit Judge:

Dipp appeals from his conviction for perjury in violation of 18 U.S.C. § 1623. The perjury charge arose out of testimony he gave in his own behalf at an earlier trial in which he was accused of conspiracy to smuggle drugs into the United States. Appellant was acquitted of the conspiracy charge. On this appeal we must decide, first, whether the perjury prosecution was barred either by the doctrine of collateral estoppel or by the prosecutorial misconduct and, second, if not so barred, whether there was sufficient evidence introduced at the perjury trial to establish the materiality of the allegedly false testimony in the initial trial. We find no bar to the perjury prosecution and that the evidence was sufficient to establish materiality. We, therefore, affirm the conviction.

## I.

### Facts.

Dipp was indicted on charges of conspiring to smuggle controlled substances into the United States from Mexico. His alleged co-conspirators, Donald Johnson and Timothy Melancon, testified against him at trial. Dipp was alleged to have provided financial support for the smuggling operation, while Johnson and Melancon actually flew the drugs into the United States. Dipp's defense at trial was that he had agreed to give Johnson financial support for a legitimate venture, but had no idea that the airplanes he helped purchase were being used to smuggle marijuana. In order

to bolster its case against Dipp, the government introduced the testimony of Paul Finefrock regarding a later smuggling operation in which Finefrock flew a plane supplied by Dipp. This evidence of subsequent criminal acts was used to show Dipp's knowledge of smuggling operations and as circumstantial evidence of his intent regarding the previous transaction. On the stand, Dipp denied meeting Finefrock more than once and categorically denied any involvement in a smuggling operation with him. Dipp was acquitted of the conspiracy charge.

Before the conspiracy trial the defense attorney sought broad discovery from the prosecution. The prosecutor stated that no written or recorded statements relating to the defendant existed. When Finefrock took the stand, a further request for Jencks Act material in regard to him was made. All that was produced at that time were the prosecutor's notes from his interview with the witness. Appellant admits that at the time Finefrock took the stand neither the prosecutor nor any of the Drug Enforcement Administration (DEA) agents directly involved in the prosecution were aware of any other material. However, after the conspiracy trial a DEA agent in the Reno office discovered that the DEA office in El Paso had a tape recording of a conversation between Finefrock and Dipp. In addition, there was a tape of a debriefing statement made by Finefrock to DEA agents following the monitored conversation with Dipp. These tapes established that Dipp had participated in a smuggling operation with Finefrock.

Following discovery of these tapes, Dipp was indicted for violating 18 U.S.C. § 1623 by reason of the false testimony he had given at the conspiracy trial concerning his relationship with Finefrock. The tape was introduced at this trial and a jury convicted Dipp of perjury. This appeal is from that conviction.

## II.

### Collateral Estoppel As A Bar.

In one of his pre-trial motions appellant argued that the perjury prosecution should be barred by the doctrine of collateral estoppel. While Dipp did not raise this issue in his appellate brief, it is appropriate to consider this issue *sua sponte* in the light of the intervening decision of this court in *United States v. Hernandez*, 572 F.2d 218 (9th Cir. 1978).

It is now established beyond question that the doctrine of collateral estoppel applies to criminal cases as part of the constitutional protection against double jeopardy. *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). As the Supreme Court there stated—"the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." *Id.* at 444, 90 S.Ct. at 1194.

This court in *Hernandez* described the collateral estoppel doctrine as follows:

When an issue of fact or law is actually litigated and determined by a final and valid judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

(Restatement of the Law, 2d, Judgments, § 68 (Tent. Draft No. 1, March 28, 1973)) 572 F.2d at 220.

Application of the doctrine, we said in *Hernandez*, involves a three-step process of analysis:

(1) An identification of the issues in the two actions for the purpose of determining whether the issues are sufficiently similar and sufficiently material in both actions to justify invoking the doctrine; (2) an examination of the record of the prior case to decide whether the issue was 'litigated' in the first case; and (3) an examination of the record of the prior proceeding to ascertain whether the issue was necessarily decided in the first case. *Id.*

In *Hernandez* we applied this three-step process and concluded that the defendant's

former acquittal barred a subsequent prosecution for perjury with respect to certain testimony of the defendant in the trial that resulted in his acquittal. The truthfulness or no of this testimony was a material issue in both proceedings, the truthfulness or no was litigated in the first case, and the first case necessarily decided that the defendant's relevant testimony was true.[1]

■ The instant case presents a substantially different situation. While Dipp's relationship with Finefrock was an issue in both trials, we cannot say that it was "litigated" in the first trial nor can we say that it was "necessarily decided" in the first trial by the jury verdict of acquittal. Finefrock's testimony at the first trial did not relate to the conspiracy for which Dipp was being tried, but involved a later conspiracy involving different persons. This testimony was only admissible to show Dipp's knowledge of smuggling operations and his apparent intent to engage in such behavior. The jury verdict of acquittal on the charged conspiracy did not necessarily decide that the jury credited Dipp's version of the relationship with Finefrock. The jury reasonably could have believed that Dipp was heavily involved in smuggling operations with Finefrock, but that there was insufficient evidence to link him with the Johnson-Melancon conspiracy. Therefore, collateral estoppel does not bar Dipp's prosecution for falsely testifying regarding his relationship with Finefrock.

Invocation of collateral estoppel to bar prosecution for perjury following an acquittal on a conspiracy charge is frequently difficult. *See United States v. Brown*, 547

F.2d 438, fn. 2 (8th Cir.), *cert. denied*, 430 U.S. 937, 97 S.Ct. 1566, 51 L.Ed.2d 784 (1977). An acquittal on such a charge need not mean that all elements required to prove a conspiracy were found to be lacking. If several elements were litigated, acquittal can mean that the jury found in favor of the defendant on only one element. A general verdict, however, does not reveal the identity of that element. *United States v. Tramunti*, 500 F.2d 1334 (2d Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974) (acquittal of conspiracy does not necessarily determine whether defendant was not at a meeting of the conspirators, particularly in light of weak evidence he ever agreed to conspire even if he was there); *see also United States v. Gugliaro*, 501 F.2d 68 (2d Cir. 1974).

Similarly, Dipp's acquittal cannot be viewed as turning solely on the jury's acceptance of his denial of Finefrock's testimony as true. Dipp vigorously denied the assertion that he had any connection with the conspiracy at all. Under these circumstances the jury could have disbelieved Dipp's testimony about Finefrock but acquitted him nonetheless. Therefore, collateral estoppel is inapplicable.

### III.

#### *Prosecutorial Misconduct As A Bar.*

Appellant also alleges that prosecutorial misconduct in the first trial (1) in using perjured testimony from Finefrock and (2) in failing to reveal a tape of a conversation between Finefrock and Dipp, pursuant to a broad discovery order, should bar the subsequent perjury prosecution.

1. In *Hernandez* the defendant was initially charged with overbilling the government for legal services provided to minority businessmen. At the trial he testified that he had met not only with both partners of a certain business together, but that he had also worked extensively with one of the partners alone. That partner was not presented as a witness in the first trial. After the jury deadlocked and a mistrial was declared, the court entered a judgment of acquittal.

Some three months later a perjury indictment was returned against the defendant, charging that he had lied regarding his meet-

ings with the partner with whom he worked alone. This partner had been located after the first trial and now asserted that he had never had any such individual meetings with the defendant. This court found that the issue in both trials was the number of hours the defendant had spent giving legal advice to this partner alone. The acquittal in the first case meant that the judge believed that the defendant had worked with this partner alone. Thus, the court necessarily decided that the defendant's relevant testimony was true. Collateral estoppel precluded the relitigation of the truthfulness of that testimony.

Assuming *arguendo* that the prosecution knowingly used perjured testimony at the first trial, appellant's conviction could have been reversed if there was any reasonable likelihood that the false testimony could have affected the judgment of the jury. *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1977). Fed.R. Crim.P. Rule 16(a)(1)(A) requires the prosecutor to produce the tape recording of Finefrock's conversation with Dipp, and while the trial judge has broad discretion in determining the sanctions for failure to comply with such an order, Rule 16(d)(2), dismissal of the charges may be an appropriate sanction in situations where the failure to produce is both wilful and severely prejudicial. *United States v. Roybal*, 566 F.2d 1109 (9th Cir. 1977); *United States v. Stofsky*, 527 F.2d 237 (2d Cir. 1975), *cert. denied*, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976).

■ These sanctions are, however, inapposite in this the perjury case. Dipp was acquitted of the conspiracy charge; he was clearly not prejudiced at the first trial by any of the alleged prosecutorial misconduct. Instead, we must decide whether the prosecutorial misconduct in the first case bars a subsequent prosecution for perjury. On the facts of this case we find no such bar. Appellant wilfully lied in the conspiracy trial when he saw that the government had no strong physical evidence supporting Finefrock's testimony. Admittedly, the inducement to lie would have been less had the government produced the tape and clarified Finefrock's position as an informant-agent. However, prosecutorial misconduct which merely increases the inducement to lie does not vest the defendant with a license to lie. It was appellant's predisposition to lie which led to this crime. *Cf. United States v. Nickels*, 502 F.2d 1173 (7th Cir. 1974), *cert. denied*, 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976).

We recognize that governmental misconduct can entrap a witness into committing perjury. *Cf. LaRocca v. United States*, 337 F.2d 39 (8th Cir. 1964). This is not such a case. There is no evidence that the prosecutor knew of the tape's existence and intentionally withheld it in order to induce Dipp to commit perjury. Nor is any alleged perjury regarding Finefrock's status as a government agent so serious as to render Dipp's predisposition to lie irrelevant.

■ Appellant further argues that the governmental misconduct here denied him the effective assistance of counsel, since if everything had been disclosed his counsel would have advised him not to take the stand. We reject this argument. The Supreme Court has clearly established that perjury is not a permissible response even when a witness' constitutional rights arguably have been violated. Thus, the failure to give *Miranda* warnings to a witness before the grand jury does not insulate him from a perjury prosecution. *United States v. Wong*, 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977); *United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976). In both these cases the Court found no fundamental unfairness in putting the witness to the choice, should he answer at all, of either incriminating himself or lying. The Court in *Wong* held that "[i]ndeed, even if the Government could, on pain of criminal sanctions, compel an answer to its incriminating questions, a citizen is not at liberty to answer falsely. . . . If the citizen answers the question, the answer must be truthful." *Id.* 97 S.Ct. at 1827.

Similarly, other circuits have held that even complete denial of counsel is no bar to a subsequent perjury prosecution. *United States v. Masters*, 484 F.2d 1251 (10th Cir. 1973); *United States v. Winters*, 348 F.2d 204 (2d Cir.), *cert. denied*, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965). The case before us, involving only minimal interference with retained counsel, presents even less reason to bar a perjury prosecution.

## IV.

*Materiality of the Perjured Testimony.*

■ Since the perjury prosecution was not barred, we must examine appellant's claims of error regarding the substantive

elements necessary to establish perjury. 18 U.S.C. § 1623 provides that "[w]hoever under oath . . . in any proceeding before . . . any court or grand jury of the United States knowingly makes any false material declaration . . . ." shall be guilty of a crime.[2] Appellant argues that there was insufficient evidence introduced at the perjury trial to show that the false testimony was material to the original conspiracy trial.

The case law has established very broad parameters for the definition of materiality. "[E]ssentially anything that could influence or mislead the trial court or the jury is considered to be material." *United States v. Whimpy*, 531 F.2d 768, 770 (5th Cir. 1976). This circuit also follows this expansive definition of the materiality element. *United States v. Anfield*, 539 F.2d 674 (9th Cir. 1976).

We note further that materiality is a question of law to be decided by the court, not the jury. *United States v. Percell*, 526 F.2d 189 (9th Cir. 1975); *United States v. Rivera*, 448 F.2d 757 (7th Cir. 1971). Therefore, the sufficiency of the evidence regarding materiality must be judged in terms of what was available to the judge.

In the instant case the judge considered the materiality issue at a hearing held on various pretrial motions made by the defendant. The judge had a complete transcript of the first trial available to him at this hearing. This transcript clearly showed that Dipp's testimony regarding his relationship with Finefrock, whether believed or not, could have influenced the jury on the issue of whether appellant had the requisite knowledge and intent to be guilty of the conspiracy charged there. The trial judge's finding of materiality thus fits easily within the broad definition.

■ Appellant argues, however, that the complete transcript must be introduced to the jury in order to establish materiality. We recognize that in *United States v. Damato*, 554 F.2d 1371 (5th Cir. 1977), the court held that there was insufficient evidence of materiality when only the allegedly false testimony was introduced to the jury. In that case, however, there was no evidence that the judge in the perjury trial considered anything more than this excerpt. A proper determination by a judge of materiality as a matter of law requires more than an excerpt. Presence of the entire transcript of the first trial and its consideration by the judge in the perjury trial eliminates the *Damato* defect.

*Damato* also recognized that since the materiality issue is to be decided by the court, evidence bearing solely on materiality should be received outside the presence of the jury. *Id.* at 1373. Thus, *Damato* impliedly approved the procedure utilized in this case, whereby the whole transcript was shown to the judge, while only the allegedly false testimony was introduced to the jury. This procedure reduces the danger of prejudice to the defendant which could be the result of placing the entire transcript before the jury. Cf. *Gebhard v. United States*, 422 F.2d 281, 289 (9th Cir. 1970); *Harrell v. United States*, 220 F.2d 516, 520 (5th Cir. 1955). The failure to introduce the complete transcript to the jury was not error.

AFFIRMED.

HUFSTEDLER, Circuit Judge, concurring:

I agree with my Brothers that double jeopardy does not bar Dipp's prosecution for perjury following his acquittal of conspiracy because the question whether Dipp met Finefrock more than once was not necessarily decided by the jury when it acquitted him.[1] I also agree that Dipp's testimo-

---

2. We note that the only evidence that Dipp had been placed under oath at the first trial was the statement in the reporter's transcript that "having been duly sworn" the witness testified. The statement is hearsay, but we have recently held that it is sufficient to establish the oath element of a perjury offense, absent an objec-

tion or upon laying a proper foundation. *United States v. Arias*, 575 F.2d 253 (9th Cir. 1978).

1. Dipp's prior relationship with Finefrock was directly in issue in the first trial because the Government relied upon Finefrock's testimony to prove Dipp's intention and knowledge. The

ny at his prior trial was sufficiently material to support a perjury charge. Finally, I agree with the conclusion that the record on direct appeal is insufficient to establish that governmental misconduct foreclosed the perjury trial. I do not join the majority opinion, however, because it implies that there may not be substance in Dipp's claims that governmental misconduct tainted the perjury trial and that an appearance of vindictiveness also infected the second trial.

Finefrock's meeting with Dipp on December 15, 1975, and Finefrock's debriefing statement to DEA agents in El Paso were both taped. In the first trial, the prosecuting attorney represented to the court that no writings existed with respect to Dipp, other than the prosecutor's own notes taken during an interview with him.[2] Throughout the conspiracy trial, DEA Agent Cameron sat with the prosecuting attorney at the counsel table. The record does not reveal any audible response by Cameron, when the prosecuting attorney asked him about the existence of any written statements regarding Dipp. Defense counsel has asserted that Cameron nodded his head affirmatively when the prosecuting attorney asked him if the only material relating to Dipp's statements was the prosecutor's own notes.

In response to defense counsel's motion to dismiss the perjury prosecution, both on the grounds of prosecutorial misconduct and on the grounds of vindictiveness, based upon

*Blackledge v. Perry* (1974) 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628, and its progeny, Agent Cameron filed an affidavit stating that he first learned of the existence of the tape recordings after the conspiracy trial, on September 2, 1976, and that he received the tapes from the El Paso DEA Office on September 24, 1976. When Cameron testified at the perjury trial, he said that he received the El Paso tapes on July 16, 1976, one month after the ending of the conspiracy trial, and not in September as he had earlier stated in his affidavit. In addition to the inconsistencies in Cameron's own testimony, other facts in the record cast serious doubt upon Cameron's truthfulness in denying his knowledge of the tapes during the first trial and raise at least an inference that Cameron was not candid with the court when he testified both by way of affidavit and by way of oral testimony in the perjury trial.

Finefrock testified that he met Cameron and his partner, Jones, in Reno, Nevada, on November 20, 1975. Cameron arranged that meeting about four or five days earlier when he called Finefrock at his home in Oklahoma and asked him to come to Reno to respond to questions about Dipp. Acting in cooperation with several DEA offices, Finefrock was sent to El Paso in December, 1975, to meet with Dipp. This was the meeting that was tape recorded. From the sequence of events, an inference arises that Cameron was one of the DEA agents par-

---

issue was also litigated because both Dipp and Finefrock testified to that relationship in the first trial. However, the issue was not necessarily decided by the jury because it could have concluded that the Government's proof of the charged conspiracy with Johnson and Melancon was unconvincing without reaching the intent and knowledge issue.

2. The transcript of the proceedings of the conspiracy trial relating to this matter in most pertinent part is as follows:

"Pike: There are no written reports with respect to the testimony regarding Mr. Dipp.

The Court: You don't have any writing at all about it?

Mr. Pike: I have my own notes that I took just talking to him. That is all the material the Government is aware of. Is that correct, Mr. Cameron?

[The record does not reveal any audible response by Camron, but defense counsel has stated that Cameron nodded his head affirmatively.]

The Court: The Government can't disclose a witness it doesn't know about.

Claiborne: He did know about it to make this motion? He must have had knowledge of it at some time, I am sure—

The Court: When did you find out about this witness?

Pike: In response to discovery, the Government indicated to counsel that there was a possibility of another witness that would go to intent, that it stood by the Jencks Act with respect to that witness. Primarily, your Honor, quite frankly because I was in fear for his safety."

ticipating in setting up Finefrock's December meeting. However, neither the fact of his participation nor the extent of it is revealed by the record. Of course, if Cameron was an active participant in arranging Finefrock's December meeting with Dipp, it would be highly unlikely that Cameron would not have been fully aware of the tape recordings well before Dipp was tried for conspiracy.

In his affidavit filed in the perjury trial, Cameron testified that he learned of the tape recordings from Finefrock at the time of the conspiracy trial. He stated: "With respect to the tape recording of a meeting between Finefrock and Dipp in a motel room in El Paso, Texas, at the time of [the conspiracy] trial Finefrock did state to your affiant that there had been a tape recording of such a meeting, and your affiant instructed DEA Agent Dick Brazill, here from Lubbock, Texas, to inquire of the El Paso office as to the existence of this tape recording. Your affiant was told by this Agent that there was no such tape recording. However, on September 2, 1976, in speaking with Agent Hal Kent of the El Paso DEA office, your affiant learned that the tape recording, did, in fact, exist and at your affiant's request, Kent sent this tape recording to the DEA Reno Task Force, and it was received by your affiant on September 24, 1976."

Cameron did not disclose to the court in the conspiracy trial his knowledge of the existence of the tape recordings, nor did he reveal that he had tried unsuccessfully to obtain the recordings. He never offered any explanation for the inconsistencies between the statements that he made in his affidavit and his testimony at the perjury trial, concerning the time that he learned the tape recordings still existed. Cameron was not cross-examined upon the statements in his affidavit. The record is barren of any evidence from which we could determine whether Cameron told the prosecuting attorney about the tape recordings or about any efforts that he may have made to locate them during the conspiracy trial.

Although the record before us on direct appeal reveals that the tape recordings were at all times in the possession of government agents and that Cameron knew that the tape recording of Finefrock's meeting with Dipp had been taped, the record is inadequate to permit us to decide whether Cameron deliberately withheld his knowledge of the tapes at the conspiracy trial or whether he misled both defense counsel and the court when he was later asked to explain the post-conspiracy trial discovery of the tapes. Under Federal Rules of Criminal Procedure 16(a)(1)(A), the Government was obligated to disclose the statements of the defendant which were "within the possession, custody, or control of the Government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the Government." Thus, even if the prosecuting attorney did not know about the existence of the tapes at the first trial, the Government may be chargeable with suppression of evidence if the prosecutor could have learned of the existence of that evidence by the exercise of reasonable diligence. (*Cf. United States v. Alvarado-Sandoval* (9th Cir. 1977) 557 F.2d 645; *United States v. Ruesga-Martinez* (9th Cir. 1976) 534 F.2d 1367.)

If, after an evidentiary hearing, it should be established that the Government suppressed knowledge of the existence of the tapes at the first trial, and then used the same evidence for the purpose of obtaining a perjury conviction, the second prosecution would be foreclosed because misconduct on the part of the Government would be a violation of due process. (*Cf. Giglio v. United States* (1972) 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104.) An inquiry into prejudice to the defendant is beside the point. The result follows, not because defendant's perjury should ever be excused, but because misconduct of the prosecution affects the integrity of the administration of criminal justice. Moreover, the taint under such circumstances does not stop with an acquittal in the first trial. Rather, the stain spreads to the second trial if it appears that the Government took advantage of its own pri-

or misconduct and tried to cover up its misdeeds in the course of the second trial.

I join the majority opinion's conclusion that governmental misconduct did not bar the second trial because, in my view, the record before us on this direct appeal is not sufficiently developed to permit us to determine whether either Cameron, or the prosecuting attorney, or both knew about the tape recordings and failed to reveal that knowledge at the conspiracy trial and whether either or both was a participant in covering up prior misconduct in the perjury trial.