398 A.2d 1036

**COMMONWEALTH of Pennsylvania**

v.

**Dennis Eugene KLINGER, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 12, 1978.
Decided Feb. 23, 1979.

22

William C. Costopoulos, Lemoyne, for appellant.

Donald L. Reihart, Special Assistant Attorney General, for the Commonwealth and with him C. Joseph Rehkamp, District Attorney, Perry County, submitted a brief on behalf of the Commonwealth, appellee.

Before PRICE, HESTER and HOFFMAN, JJ.

24

HESTER, Judge:

■ On June 7, 1976, the lifeless body of Hazel Pulaski was discovered in a remote, mountainous region known as Lambs Gap, in Perry County. She had been missing for ten days and was the object of an intensive search by family, friends, and police. Her son, appellant Dennis Klinger, was formally charged with her murder and, following an eight day jury trial, during which over 30 witnesses testified, including appellant, he was found not guilty. Eight months later, the Perry County District Attorney charged appellant with various counts of perjury, false swearing, and conspiracy[1] relative to appellant's trial testimony. At a preliminary hearing on June 20, 1977, appellant was ordered held for court on four counts of perjury and one count each of false swearing and conspiracy. A motion to dismiss, contending the prosecution is barred by double jeopardy and collateral estoppel, was denied. This appeal followed.[2]

■ Whether a prosecution is barred by a former verdict of acquittal on a different charge is determined by Section 110 of the Crimes Code, 18 C.P.S.A. §§ 110. That section provides in pertinent part:

§ 110. When prosecution barred by former prosecution for different offense

Although a prosecution is for a violation of a different provision of the statutes than a former prosecution or is based on different facts, it is barred by such former prosecution under the following circumstances:

* * * * * *

(2) The former prosecution was terminated, after the indictment was found, by an acquittal or by a final order or

1. Act of Dec. 6, 1976, P.L. 1482, No. 334, §§ 1, 18 C.P.S.A. §§ 4902, 4902, 903, respectively.

2. Jurisdiction rests in this Court pursuant to the Appellate Court Jurisdiction Act, 17 P.S. §§ 211.302. Denial of a pre-trial application seeking discharge on double jeopardy grounds is a "final order" for purpose of §§ 211.302 and is thus appealable prior to trial. *Commonwealth v. Bronson,* 482 Pa. 207, 393 A.2d 453; *Commonwealth v. Bolden,* 472 Pa. 602, 373 A.2d 90 (1977); *Commonwealth v. Haefner,* 473 Pa. 154, 373 A.2d 1094 (1977).

judgment for the defendant which has not been set aside, reversed or vacated and which acquittal, final order or judgment necessarily required a determination inconsistent with a fact which must be established for conviction of the second offense.

We have recognized that Sec. 110(2), although a "cumbersome statute", does no more than codify settled principles of collateral estoppel in criminal cases: That once a former prosecution necessarily establishes an ultimate fact in favor of a defendant, then a subsequent prosecution depending upon a contrary finding must be barred. *Commonwealth v. Shelhorse*, 252 Pa.Super. 475, 381 A.2d 1305, 1308 (1977).[3] In *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 409 (1970), the Supreme Court found the collateral estoppel doctrine is embraced by the federal constitutional proscription against double jeopardy and stated the reviewing court's approach as follows:

"Collateral estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.

The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from

---

3. Courts of this Commonwealth applied collateral estoppel in the criminal context long before the enactment of Sec. 110(2). See e. g. *Dinkey v. Commonwealth*, 17 Pa. 126 (1851). More recently, see *Commonwealth v. Rose*, 214 Pa.Super. 50, 251 A.2d 815 (1969), reversed on other grounds, 437 Pa. 30, 261 A.2d 586 (1970).

consideration." The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Sealfon v. United States*, 332 U.S. 575, 579, 68 S.Ct. 237, 240, 92 L.Ed. 180. Any test more technically restrictive would of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal. [Footnote omitted].

397 U.S. at 443–4, 90 S.Ct. at 1194; *Commonwealth v. Grazier v. Studebaker*, 481 Pa. 622, 393 A.2d 335; See also *Commonwealth v. Campana (I)*, 452 Pa. 233, 304 A.2d 432, vacated, 414 U.S. 808, 94 S.Ct. 73, 38 L.Ed.2d 44 (1973), reinstated, 455 Pa. 622, 314 A.2d 854 (*Campana II*), cert. den., 417 U.S. 969, 94 S.Ct. 3172, 41 L.Ed.2d 1139 (1974). *Commonwealth v. DeVaughn*, 221 Pa.Super. 410, 292 A.2d 444 (1972).[4] Accordingly, we now turn to a consideration of appellant's murder trial. We will then construe each perjury charge to determine if the general verdict of acquittal in the murder trial will necessarily foreclose any issues sought to be proven in the perjury trial.

The commonwealth's case against appellant was entirely circumstantial, as there were no eyewitnesses to the killing. Undisputed testimony showed that on Friday, May 28, 1976, at approximately 7:20 A.M., appellant walked into the West Shore Youth Counseling Center in Camp Hill, Pa., and was met by Vincent O'Reilly, a counselor. Appellant informed O'Reilly that he wanted to "turn himself in" to his parole officer because he had been in violation of his parole conditions.[5] Appellant called his mother from O'Reilly's office and asked her to pick him up at a nearby shopping center

4. The Double Jeopardy Clause is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). *Grazier*, supra. Pennsylvania's double jeopardy clause is found in Art. 1, Sec. 10, and differs "only stylistically" from the parallel federal provision. *Campana I*, supra.

5. Appellant had served four months in jail for forging several of his mother's checks and had been paroled in April, 1976.

and to drive him to his parole officer. The deceased, Hazel Pulaski, was seen meeting appellant in her brown Pinto at the shopping center about 7:40 A.M., and the two drove away. Appellant was not seen again by a Commonwealth witness until 9:00 or 9:15 A.M. the same morning at the home of his friend Carol Durkin, in Camp Hill. Appellant at that time was driving the Pinto and was not accompanied by his mother. Mrs. Pulaski was not seen alive again. The critical time period, then, was between 7:40 A.M. and 9:15 A.M. on May 28, 1976. It was stipulated by counsel, and the jury was advised, that if appellant murdered his mother, it had to have occurred within that time slot. (Trans., 10/12/76, Daytime, p. 31). The events transpiring within that gap were much in dispute.

The Commonwealth proceeded on the theory that appellant drove his mother from the Camp Hill shopping center to a damp, wooded area known as Lambs Gap, where he killed her[6] and left her face down near a small stream.[7] Appellant then proceeded to Carol Durkin's home, in whose company he spent the remainder of the morning. Friday evening, appellant took his girlfriend Allyson Weiss, to the Maryland shore, where the two remained until Monday evening, May 31. By that time, intensive search efforts had been launched for Mrs. Pulaski and suspicion of foul play had centered on appellant. He eluded authorities until his arrest on Wednesday, June 2.

Much of the Commonwealth's evidence focused on appellant's motive and opportunity to kill his mother. It was shown Mrs. Pulaski had recently preferred charges against her son for forging and cashing her checks and that appellant was bitter toward her for refusing to post bail for him

6. Cause of death was determined to be asphyxia. The victim had inhaled a large quantity of foreign material, principally sand, gravel, small twigs, and plants. It was not disputed that cause of death and the pathologist's findings were consistent with a homicide.

7. The Commonwealth's case left open the possibility that Mrs. Pulaski was killed somewhere else, and then taken to Lambs Gap. There was conflicting testimony on whether the foreign material found in her lungs came from Lambs Gap or from some nearby region.

on several occasions. Further, the Commonwealth established appellant was very familiar with the Lambs Gap region, having travelled there "every weekend" with friends. (Trans. 10/13/76, Daytime, pp. 57–8). Commonwealth evidence also stressed appellant's weekend flight to the shore following his mother's disappearance and his furtive activity up to the day of his arrest.

The defense presented a different version of the events of May 28. Appellant stated he was not in the Lambs Gap area that morning, but drove his mother to a site some 3¼ miles distant therefrom, a region known as Millers Gap. There, appellant requested his mother's aid in locating camping equipment he had left there the previous day.[8] Appellant parked the car and he and his mother walked along a fire trail for some distance before splitting up, at appellant's behest, to search the area for the equipment. Once appellant lost sight of his mother, he doubled back to the car and drove away. Appellant explained this deceit by stating he needed his mother's car to spend "one last weekend" with Allyson Weiss before he went to jail for parole violations.[9] (Trans. 10/11/76, Evening, p. 47). Appellant was confident his mother could seek refuge at Tillie Miller's, whose home was in Millers Gap.

As he drove from Millers Gap that morning, appellant made a brief detour up Lambs Gap road in an effort to locate two individuals from whom he wished to purchase marijuana.[10] He spotted and waved to these two along the side of the road, but did not stop since there was traffic behind him. Appellant then proceeded to Carol Durkin's home.

He returned Monday night from Maryland and soon learned his mother was missing and that he was the focus of

8. Appellant admitted at trial there was in fact no camping equipment at Millers Gap, as he had removed it the day before.

9. Appellant stated he thought he had violated his parole by failing to keep steady employment.

10. These two fellows later turned out to be, apparently, Christ and Duncan.

investigation. He eluded authorities until June 2, he explained, because he had heard the police would shoot him.

The defense repeatedly stressed that appellant's version of the events of May 28 and the period thereafter remained consistent from the day of his arrest to the time of trial and that he was, in large part, corroborated by Commonwealth witnesses. The defense also attempted to divert suspicion to the deceased's husband, Robert, appellant's stepfather. It was shown Robert Pulaski was continually upset with Hazel for her refusal to amend the deed on the house to include his (Robert's) name. Further, cross-examination of Mr. Pulaski elicited several inconsistencies in what *he* was doing and where *he* was the morning of his wife's disappearance.

Commonwealth and defense witnesses both testified to "timed runs" they had made, tracing the alleged routes of appellant the morning of the 28th. The conclusion was drawn that appellant could have travelled from Camp Hill to either Lambs or Millers Gap, and then to Carol Durkin's home, consistent with the 7:40 A.M.–9:15 A.M. framework.

The court's charge to the jury properly stressed the Commonwealth's burden of proof and mentioned specifically several factors for the jury to consider: whether another person may be responsible for the death, whether the killing occurred in an area other than where the body was found (see n. 7., supra), the effect of prior inconsistent and consonant statements, and how the jury should construe evidence of motive and flight.

We will now turn to the specific perjury crimes, all of which emanated from appellant's trial testimony. Count I charges appellant lied when he stated on cross-examination that he did not kill his mother and does not know who killed his mother, the count averring that appellant did kill his mother. Count II charges appellant lied when he stated on direct that he saw and waved to Christ and Duncan on Lambs Gap road after leaving Millers Gap, the count averring he never saw them that morning. Count III charges appellant lied when he stated on direct that the last time he

saw his mother was when he lost sight of her on Millers Gap and doubled back to the car, the count averring that the last time he saw his mother was when he struck her. Count V [11] charges appellant lied when he stated on cross that one Nielson was the first person to whom he related the events of Millers Gap,[12] the count averring that appellant had earlier told one Sue Ann Guise that he had struck his mother and left her on the mountain. Count VI charges appellant lied when he detailed the route taken with his mother from Camp Hill to the mountain, the count averring the two had stopped at a manufacturing plant to ask about employment. Count VII charges appellant conspired with his defense attorney to commit the foregoing crimes of perjury.

Following a plenary review of the proceedings below, we are of the opinion that only the ultimate fact of Count I is barred from being litigated again. Whatever else the jury *may* have decided by its general verdict of acquittal, it is clear that it necessarily determined appellant did *not* murder his mother. To hold otherwise would distort the plain meaning of the jury's "not guilty" verdict. Hence, appellant cannot be tried for falsely denying he killed his mother, the jury having clearly resolved that question in his favor.

Counts II through VII, however, deal with collateral portions of appellant's testimony which, although important for the jury to consider, were not *necessarily* passed upon in reaching the verdict. The jury was not required to believe, for example, that appellant did see Christ and Duncan on the mountain (Count II). A rational jury could find appellant did not kill his mother and then saw no one at all on his route to Miss Durkin's. Nor was the jury required to find appellant never struck his mother or never told anyone he struck his mother (Counts III and V). Thus, the jury could find appellant struck his mother, out of hostility proven at trial, but did not kill her. Further, a verdict of not guilty does not also require a finding that appellant pursued the

11. Count IV was dismissed at the preliminary hearing.

12. Nielson was an Outreach worker at the West Shore Youth Center.

course to Millers Gap to which he testified (Count VI). The Commonwealth made repeated attempts to shake this portion of appellant's testimony and a rational jury could find appellant not guilty of murder without also deciding he took this route or that. Finally, the conspiracy charge (Count VII) was not conclusively determined by the jury.[13]

We think it clear that, based upon this voluminous record and the large number of factual issues submitted, a "rational jury could have grounded its verdict upon [issues] other than [those] which the defendant seeks to foreclose from consideration." *Ashe,* supra. A general finding of not guilty of murder is not "inconsistent with . . . fact[s] which must be established for conviction" of the perjury counts. Sec. 110(2).

Our Court has, on two prior occasions, considered the question of perjury prosecutions following acquittal[14] and, in each case, found the charges permissible since "the acquitting fact-finder was not required to rule upon the truth or falsity of the challenged statement in order to reach the verdict." *Commonwealth v. Rose,* supra, reversed in other grounds, 437 Pa. 30, 261 A.2d 586 (1970). And in *Commonwealth v. Mervin,* 230 Pa.S. 552, 326 A.2d 602 (1974), we said, "[I]t is manifestly clear that the ultimate issues of fact involved in the two proceedings [assault v. perjury] were entirely different, thus precluding the applicability of collateral estoppel . . . To sustain appellant's argument . . . would be to allow the concept of collateral estop-

13. Count VII alleges appellant conspired to lie about all the issues in Counts I through VI. Since we hold the fact sought to be proven in Count I is now foreclosed, appellant may not be tried for conspiracy as to Count I.

14. Other jurisdictions have likewise confronted the problem and have undertaken an analysis similar to ours. Because each case turns on an examination of the former proceeding, the results go both ways. See, *U. S. v. Williams,* 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747 (1950) (perjury prosecution not barred); *U. S. v. Gugliaro,* 501 F.2d 68 (2nd Cir., 1974) (perjury prosecution not barred); *Adams v. U. S.,* 287 F.2d 701 (5th Cir., 1961) (not barred); *U. S. v. Drevetzki,* 338 F.Supp. 403 (N.D.Ill.1972) (barred); *State v. DeSchepper,* 304 Minn. 399, 231 N.W.2d 294 (1975) (not barred); *People v. Houseman,* 44 Cal.App.2d 619, 112 P.2d 944 (1941), *cert. den.* 314 U.S. 660, (1941) (not barred).

32

pel, which is designed to protect an accused from prosecutorial harassment to be used as a shield to insulate a defendant from his own wrongdoing in fraudulently obtaining a favorable result in a criminal case." id., 230 Pa.Super. at 560, 326 A.2d at 606–7.[15]

As this case illustrates, collateral estoppel, because of its "inherent limitations" affords only limited protection to a defendant from successive prosecution. See *Campana I*, 452 Pa. at 246–7, 304 A.2d at 438. Where a jury has a multitude of issues to consider in its deliberations and the verdict on its face does not reflect on what the decision is based, the court cannot say with certainty that any one issue is conclusively adjudicated. Simply stated, neither the Double Jeopardy Clause nor Sec. 110(2) provide appellant the relief he seeks. See also, *Commonwealth v. Hogan*, 482 Pa. 333, 393 A.2d 1133.

Accordingly, we reverse that portion of the lower court's order which directs appellant to be tried on Count I and that part of Count VII relating to Count I. In all other respects we affirm and remand for trial.

Affirmed in part and reversed in part.

HOFFMAN, J., files a dissenting opinion.

15. "Double jeopardy does not bar the perjury prosecution since the offenses are different and honest testimony under oath must be insisted upon even in the case of persons defending themselves against charges of crime . . . In such a situation [estoppel v. perjury], one may legitimately prefer to preserve the sanction against perjury, which is always an evil, rather than be moved by the mere opportunity for abuse, which conscientious prosecutors would reject. [R]arely, if ever, does a general verdict of not guilty 'necessarily require a determination' on any particular fact asserted by the defendant". Comments, Model Penal Code, Tent. Draft No. 6 (1956), p. 122–3. We also reject the notion that a verdict of acquittal means the jury believed all of a defendant's testimony and that of his witnesses. "The theory that when a jury acquits a defendant in a criminal proceeding, it thereby finds to be true the testimony of all witnesses called upon his behalf is not supported by reason or the common knowledge of mankind." *People v. Houseman*, supra, 44 Cal.App.2d 619, 623, 112 P.2d 944, 947, (1941), cert. den. 314 U.S. 660, 62 S.Ct. 114, 86 L.Ed. 529 (1941).

HOFFMAN, Judge, dissenting:

I agree with the majority that all Counts except the first are not barred under Section 110(2) of the Crimes Code, because, as the opinion demonstrates, none of the Commonwealth's averments here were "necessarily" determined in appellant's favor by the general verdict of acquittal at his murder trial.

However, the majority opinion has not distinguished—in fact has lumped together—state statutory collateral estoppel (Section 110) and the Fifth Amendment *constitutional* requirements of collateral estoppel found in the double jeopardy clause, *Ashe v. Swenson*, 397 U.S. 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). While our statute permits a collateral estoppel defense only when the prosecution seeks to re-litigate facts "necessarily" decided in a defendant's prior trial, "[t]he federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. . . . The inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Ashe v. Swenson, supra* at 444, 90 S.Ct. at 1194. Indeed, the federal decisions indicate that constitutional collateral estoppel is not limited to ultimate issues of fact necessarily decided at a prior trial, but also extends to evidentiary facts which are litigated, when the evidence presented in both trials will be substantially the same. "[T]he Government . . . may not in a second trial relitigate an issue of either ultimate fact or evidentiary fact upon which the defendant was acquitted in an earlier trial." *U. S. v. Gurney*, 418 F.Supp. 1265, 1268 (M.D.Fla.1966). *See also Wingate v. Wainwright*, 464 F.2d 209, 213 (5th Cir. 1972) (government may not charge second offense after acquittal on first which would force a defense against the same factual allegations, even though they are only evidentiary).

As the Court in *U. S. v. Drevetzski*, 338 F.Supp. 403, 409 (N.D.Ill.1972) said in barring a perjury prosecution after the defendant's acquittal in his previous trial: "While 'if at first

you don't succeed try, try again' may be a lofty and worthy ideal for the general public it has no place in the area of criminal prosecution where that first attempt at success has fully and completely adjudicated the issues and where the second prosecution merely rehashes old evidence." Undoubtedly the reason for this Fifth Amendment protection is that "[f]or whatever else that constitutional guarantee may embrace, . . . it surely protects a man who has been acquitted from having to 'run the gantlet' a second time." *Ashe v. Swenson, supra* at 445, 90 S.Ct. at 1195. The federal courts have therefore been cognizant of the potential danger of subsequent perjury prosecutions allowing abusive and vindictive prosecutors taking a second shot at acquitted defendants with the same evidence. *See Adams v. U. S.*, 287 F.2d 701, 703 (5th Cir. 1961). *See also*, Toll, Pennsylvania Crimes Code Annotated 537.

As the majority's recitation of the facts indicates, the Commonwealth showed that appellant had a motive and an opportunity to commit the murder. Looking at the trial "in a practical frame," and "with an eye to all the circumstances," I would say that the jury most likely acquitted appellant because they believed his testimony and found his alibi credible. That being the case, I would not permit the Commonwealth a second chance to prove that appellant's testimony was false in any of its evidentiary details. All that their case-in-chief can possibly do is re-hash all the old evidence surrounding the details of appellant's alibi in hope that a second jury will now disbelieve him in whole or part when the first jury found him credible. However, this is precisely that *Ashe* and the other federal cases cited here forbid, on constitutional grounds.

Moreover, a review of the averments in the Commonwealth's information, when compared to the evidence produced at the murder trial, indicates that the Commonwealth has an extremely weak perjury case, even though the majority allows it to be tried.

For instance, Count II charges that appellant lied when he said he saw two friends on Lambs Gap Road when he was

returning to Camp Hill on the day in question. The Commonwealth does not contend that appellant was not on the road, or that the two friends were not on the road at the same time. (In fact, the Commonwealth called these two individuals at the murder trial and proved their presence on the road). Apparently somehow the Commonwealth intends to prove that while the two friends were on the road and appellant had an opportunity to see them, he did not in fact see them! Bringing a perjury charge on these averments can be described as childish.

Count III avers that the appellant lied when he said that the last time he saw his mother was when he deserted her at Millers Gap, because actually the last time he saw her was when he struck her. Since the jury acquitted appellant of murder, the Commonwealth will thus have to prove that appellant delivered some non-lethal blow to his mother on the day in question at a place other than Millers Gap and then deserted her. We can by mental gymnastics conjure up this possibility, but how can the Commonwealth possibly prove this averment? Since there were no eyewitnesses, the Commonwealth has no chance unless the appellant himself changes his testimony and inculpates himself.

Count IV charges that appellant lied when he stated that he didn't think he had told anybody of his mother's whereabouts up to a certain time, when in fact he earlier told one Sue Ann Guise that he had struck his mother and left her on the mountain. First of all, appellant was uncertain at this point of his testimony. Secondly, the Commonwealth will have to prove a conversation in which appellant confesses to a crime which the murder jury said he did not commit. Lastly, since it is not alleged that anyone overheard this alleged admission to Ms. Guise, the two witness rule appears to be a difficult obstacle to the Commonwealth in proving this averment, unless they induce appellant to change his testimony and inculpate himself.

Count VI charges that appellant lied when he recounted his route taken to Miller Gap, because he omitted making a stop at the Valk Manufacturing Company. In the murder

trial, three witnesses testified, and the Commonwealth therefore stipulated, that a round trip from Camp Hill to either Millers Gap or Lambs Gap took a full hour and a half, the time elapsed between appellant's departure and his return when seen at Carol Durkin's house. For the Commonwealth to prove an additional excursion five to ten minutes out of the way, to a place where they allegedly stayed ten to fifteen minutes, puts an unbearable strain on the stipulated time framework of the events in question.

Because of the extreme weakness of the Commonwealth's case, I think it is questionable whether the information here is brought in good faith.[1] It is my view that the Fifth Amendment, as construed by *Ashe v. Swenson, supra,* protects the appellant from having to endure the hardship of defending criminal charges a second time.

I would reverse the order below and dismiss the information.

1. The judge at appellant's murder trial, the Hon. Keith B. Quigley, learning of the District Attorney's intent to charge appellant with perjury, requested the D.A. to submit his case to the Attorney General for an impartial review. The case was assigned to Deputy Attorney General Bernard L. Seigel, who reviewed the evidence and concluded that appellant should not be prosecuted.