406 A.2d 1123

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Gerhard STEPPKE**

Superior Court of Pennsylvania.

Submitted Sept. 15, 1978.

Decided June 29, 1979.

Petition for Allowance of Appeal Denied February 25, 1980.

D. Michael Emuryan, Deputy District Attorney, Media, for appellant.

James P. McHugh, Chester, for appellee.

Before CERCONE, SPAETH and LIPEZ, JJ.

SPAETH, Judge:

This is an appeal by the Commonwealth. Appellee was charged with solicitation and attempt to tamper with public records,[1] obstructing the administration of law,[2] and conspiracy.[3] A jury acquitted him of solicitation and attempt to tamper, but was unable to agree as to obstructing the administration of law and conspiracy. The lower court then entered an order dismissing the charges of obstructing the administration of law and conspiracy, on the ground that a retrial on those charges would violate *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), and the Crimes Code, *supra*, 18 Pa.C.S.A. § 110(2). This appeal followed.

On March 5, 1977, the day the events leading to trial began, appellee was a captain on the police force in Chester, Pennsylvania, and the superior of Officer William Parker, the Commonwealth's chief witness against him. Parker, who had been granted immunity, testified as follows.

On March 5, Parker received information from an informant that implicated Kathleen Nacrelli, the daughter of the Mayor of Chester, and a Raymond ("Moose") Keene of involvement with drugs. Parker reported this to appellee and was told to get more information. Later that day, Parker stopped Nacrelli and Keene, who were driving in an old Chevrolet with no license tags. Keene had a valid driver's license but no valid owner's card. Parker called Officer Wendell Butler of the narcotics unit for assistance. Butler found drugs on both Nacrelli and Keene, but no drugs in the car. Parker, however, then searched the car

1. The Crimes Code, Act of Dec. 6, 1972, P.L. 1482, No. 334, § 1, 18 Pa.C.S.A. § 4911.

2. The Crimes Code, *supra*, 18 Pa.C.S.A. § 5101.

3. The Crimes Code, *supra*, 18 Pa.C.S.A. § 903.

and found drugs.[4]  Nacrelli and Keene were taken to police headquarters and the car was towed.

At headquarters, Parker told appellee what had happened and asked if appellee wanted to telephone Mayor Nacrelli about it.  Appellee agree that this should be done.  Parker left appellee's office.  When he returned, appellee told him the mayor had been called.  After questioning Nacrelli and Keene, appellee released them.  Then he directed Parker to write two reports: one report about stopping the car for lacking tags, and a second report about finding the narcotics, not, however, on Nacrelli and Keene and in the car but somewhere else, since the true circumstances of finding the narcotics had to be covered up.

Parker then wrote a report about stopping the car and a second report stating that the drugs had been found behind a diner after a boy had run up to the police to say someone had hidden them there;  no connection to Keene and Nacrelli was stated.  Appellee later told Parker that he had read both reports and they were all right.

The news about the arrests became known to the press.  The following week Parker was questioned by the FBI, but stuck to his falsified story.  He and appellee had a number of conversations about the reports, agreeing that as long as they stuck to the story, nothing would come of it.  However, the FBI agents ultimately persuaded Parker to change the story, and he told them what he testified to at the trial.  After that, appellee summoned Parker to his house.  When Parker explained that he feared prosecution and didn't have the money to fight it, appellee told him a lawyer wouldn't cost him anything.

Other Commonwealth witnesses, in particular Officer Butler, corroborated various aspects of Parker's testimony.  Butler testified that appellee had directed Parker to falsify the reports.  Butler also testified that appellee had at first suggested to him that the drugs be destroyed, but on his protest, agreed they should be sent to a laboratory for

---

4.  Butler told Parker at that time that the car search was unlawful. Its lawfulness is not in question here.

analysis, as usual. Butler also testified that after appellee directed the falsification of the reports, he asked appellee, "Is my man covered?", meaning Parker, and that appellee replied that he would be.

Appellee took the stand in his own defense. He testified that Parker indeed had told him that Nacrelli and Keene had been stopped for not having tags. However, he said, in explaining the drugs, Parker told him the same story of two unconnected incidents as he later wrote in his reports; appellee denied he ever had reason to disbelieve this story of two unconnected incidents until April 22, when Parker gave a statement to the district attorney's office saying that the story was false. Appellee admitted calling Mayor Nacrelli, but said it was out of courtesy and that the mayor had told him, "You do your job." He admitted telling Butler that Parker would be "covered," but explained he was only talking about any worry that the mayor would be angry because his daughter had been stopped. He admitted suggesting that the drugs be destroyed, but said the suggestion was only made to save time and energy, because there was, as he understood it, no suspect connected with the drugs. He admitted telling Parker to stand by his reports, but explained that he thought the reports were true. He admitted seeing Parker after Parker's statement to the district attorney, but contradicted Parker by saying that he only told Parker, "That's up to you." [5]

Parker's credibility was subjected to a heavy attack through evidence that, some months after the incident, he was involved in a dispute with another officer and charges were filed by various parties, none of which, however, went to trial.

5. There was much testimony concerning the fact that someone at some point blackened out a number denoting a drug arrest, which appeared on the police radio dispatcher's initial complaint card, and replaced it with a number denoting an automobile violation. Other testimony established that certain records concerning the arrest of Nacrelli and Keene disappeared for a time from the police record file. Appellee denied any connection with these events.

As the lower court observed, the particular aspect of the ban against double jeopardy, U.S.Const., amend. V, involved here is the doctrine of collateral estoppel, explored in *Ashe v. Swenson, supra.*[6] In that case, a defendant was charged with robbing a number of players at a card game but was initially brought to trial for the robbery of only one of the players. He was acquitted. Since it was unquestioned that a robbery had occurred, the Supreme Court concluded that the jury must have found that the defendant was not the robber. Thus, when the state tried the defendant again, this time for the robbery of a second card player, the Court concluded that the trial violated the ban against double jeopardy, for the defendant's nonparticipation in the robbery had already been established by the first jury. In *Commonwealth v. Shelhorse*, 252 Pa.Super. 475, 381 A.2d 1305 (1977), this court held that the *Ashe v. Swenson* doctrine of collateral estoppel is embodied in the Crimes Code, supra, 18 Pa.C.S.A. § 110(2), which bars a second prosecution if

> [t]he former prosecution was terminated, after the indictment was found, by an acquittal . . . which acquittal . . . necessarily required a determination incon-

**6.** Regarding the doctrine of collateral estoppel, our Supreme Court has said:

> The protection afforded a defendant against successive or repeated prosecutions by the doctrine of collateral estoppel, however, is diminished considerably by its inherent limitations. That imprecise doctrine has proven quite difficult and burdensome for appellate courts to properly and uniformly apply. Before the doctrine of collateral estoppel can apply the first trial must end in acquittal, and a "rational" reading of the record must disclose that the jury based its verdict of acquittal on but *one* issue.

> *Commonwealth v. Campana*, 452 Pa. 233, 246–47, 304 A.2d 432, 437 (1973), *vacated and remanded*, 414 U.S. 808, 94 S.Ct. 73, 38 L.Ed.2d 44 (1973), *on remand*, 455 Pa. 622, 314 A.2d 854, *cert. denied*, 417 U.S. 969, 94 S.Ct. 3172, 41 L.Ed.2d 1139 (1974) (footnotes omitted).

Despite these difficulties, in a number of cases the doctrine has been applied to bar a second prosecution. *See, e. g., Commonwealth v. Peluso*, 481 Pa. 641, 393 A.2d 344 (1978); *Commonwealth v. Grazier*, 481 Pa. 622, 393 A.2d 335 (1978); *Commonwealth v. Klinger*, 264 Pa.Super. 21, 398 A.2d 1036 (1979); *Commonwealth v. Dooley*, 225 Pa.Super. 454, 310 A.2d 690 (1973); *Commonwealth v. DeVaughn*, 221 Pa.Super. 410, 292 A.2d 444 (1972).

sistent with a fact which must be established for conviction of the second offense.

The first question, then, is, What facts must the jury have found when it acquitted appellee of solicitation and attempt to tamper with public records?[7] These facts identified, the next question is, Would the jury have to make findings contrary to these facts, to convict appellee of obstructing the administration of law,[8] or of conspiracy?[9]

In identifying what facts the jury must have found when it acquitted appellee of solicitation and attempt to tamper

7. Tampering is defined as:
(a) **Offense defined.**—A person commits an offense if he:
(1) knowingly makes a false entry in, or false alteration of, any record, document or thing belonging to, or received or kept by, the government for information or record, or required by law to be kept by others for information of the government;
(2) makes, presents or uses any record, document or thing knowing it to be false, and with intent that it be taken as a genuine part of information or records referred to in paragraph (1) of this subsection; or
(3) intentionally and unlawfully destroys, conceals, removes or otherwise impairs the verity or availability of any such record, document or thing.
Crimes Code, *supra*, 18 Pa.C.S.A. § 4911.

8. Obstruction is defined as:
A person commits a misdemeanor of the second degree if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act, except that this section does not apply to flight by a person charged with crime, refusal to submit to arrest, failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.
Crimes Code, *supra*, 18 Pa.C.S.A. § 5101.

9. Conspiracy is defined as:
(a) Definition of conspiracy.—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.
Crimes Code, *supra*, 18 Pa.C.S.A. § 903.

with public records, we must follow the admonition of *Ashe v. Swenson, supra* :

> The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Sealfon v. United States,* 332 U.S. 575, 579, [92 L.Ed. 180, 184,] 68 S.Ct. 237 [, 240.] Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal. 397 U.S. at 443–44, 90 S.Ct. at 1194 (footnotes omitted).

A review of the record conducted in this spirit compels us to conclude that the jury could have acquitted appellee of solicitation and attempt to tamper with public records *only* by believing *his* testimony rather than Parker's, that is, by finding that appellee did not direct Parker to write false reports. No rational jury could have found that the reports Parker wrote were *not* false, or that any other requirement of the statutory definition of tampering was not met. Thus the case resembles *Ashe v. Swenson,* with acquittal turning on one discernible issue. However, further consideration will show that the case is more complex than *Ashe v. Swenson,* for as to some of the charges, the jury was unable to reach a verdict. This inability makes it evident that while the jury resolved the contradictory testimony in appellee's favor *so far as* the testimony bore on the question of whether appellee directed Parker to write false reports, it

did *not* resolve all the contradictions in appellee's favor, by believing appellee instead of Parker. If that had been so, the jury would have acquitted appellee of all charges.

A jury may believe all, part or none of the witnesses' testimony. *Commonwealth v. Myrick*, 468 Pa. 155, 360 A.2d 598 (1976); *Commonwealth v. Williams*, 236 Pa.Super. 184, 345 A.2d 267 (1975). In this case, the mixed verdict may be explained by the possibility that some jurors decided that although appellee did not initially direct Parker to write false reports, he later, after the story "broke," learned that the reports were false, and urged Parker to stick by them and agreed with Parker that he should do so, thereby, in the view of these jurors, obstructing the administration of law and conspiring with Parker to do so.[10] Since other jurors did not agree with this view of the testimony, the jury was unable to agree except to the extent of finding that appellee did not direct Parker to write false reports.

This narrow reading of the verdict does not expose appellee to the various dangers that the ban against double jeopardy was intended to guard against. The Commonwealth did not bring the charges piecemeal as a harassing technique. *See Commonwealth v. Campana, supra.* Nor did the Commonwealth intend the prosecution to be a "trial run," *see Ashe v. Swenson, supra* ; for with no other charges in the offing, the Commonwealth would have had no recourse against appellee in the event of complete acquittal. Nor does this case suggest prosecutorial vindictiveness, as Judge HOFFMAN , in dissent, sensed in *Commonwealth v. Klinger*, 264 Pa.Super. 21, 398 A.2d 1036 (1979). There, the defendant had been charged with murder. He testified in his own defense, and was acquitted. The Commonwealth then charged him with having perjured himself during his

---

**10.** The lower court's opinion states that from the informations and testimony at trial, it is clear that all the charges were based on the alleged order to falsify the reports. However, the information charging obstructing administration of law says only that appellee obstructed (etc.) the administration of law by breach of official duty. Nor does the information charging conspiracy specify that the conspiracy was only to falsify the reports; it includes obstructing administration of law among the list of intended crimes.

testimony in the murder trial. The majority of the panel found that the acquittal of murder did not mean that the jury must have believed all the details of the defendant's testimony, and the details were the basis of most of the perjury charges.[11] Judge HOFFMAN disagreed, saying that the jury had most likely acquitted the defendant of murder because it believed his alibi, including all the details. The same cannot be said here, given the jury's inability to agree.

We hold that the Commonwealth may retry appellee for obstruction of administration of law and conspiracy, but that if it does, it may not try the case on the theory that those crimes arose from a direction by appellee that Parker falsify his reports.[12]

Reversed.

$$\blacksquare$$

---

11. The majority did find that the acquittal of murder barred a perjury prosecution based on appellant's denial that he killed the victim.

12. Neither the Commonwealth attempt to establish appellee's guilt in blotting out the number on the complaint card, see note 5, supra. The information charging tampering covered the complaint cards as well as the reports, so the acquittal of tampering established appellee's innocence as to both the complaint cards and the reports.