J-S11026-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| JOHN ADAMS | |
| Appellee | No. 1529 EDA 2015 |

Appeal from the Order December 8, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0013625-2012

BEFORE:  FORD ELLIOTT, P.J.E., OTT, J., and MUSMANNO, J.

MEMORANDUM BY OTT, J.:                           **FILED JUNE 07, 2016**

The Commonwealth appeals from the order entered on December 8, 2014, in the Court of Common Pleas of Philadelphia County, granting defendant, John Adams', motion to dismiss based on collateral estoppel. The Commonwealth argues the trial court committed an error of law dismissing the charges against Adams regarding one victim after a jury acquitted Adams of having shot and wounded a second victim.  After a thorough review of the submissions by the parties, relevant law, and the certified record, we reverse and remand this matter for retrial.

The facts of the underlying trial involve a melee at the Travelers Motorcycle Club in Philadelphia, Pennsylvania, on August 5, 2012.  A tribute was being held for a fallen member of a motorcycle club that night. Apparently, members of several motorcycle clubs were in attendance.  A

fight erupted inside and some "civilians" were ejected from the club. The fight spilled out into the parking lot. The defendant, John Adams, was one of those civilians. The victims, Darryl Jenkins and Gregory Gordon, were associated with the Wheels of Soul motorcycle club.

The Commonwealth alleged that after being ejected from the property, Adams returned minutes later and began shooting. Gordon was shot in the shoulder. Video surveillance of the parking lot showed a person the Commonwealth believed to have been Adams, firing a handgun. Jenkins then ran after the shooter and was shot in the foot. The video surveillance does not show the second shooting; therefore, there is no video evidence of who fired the second set of shots.

Although Jenkins identified Adams as the shooter in his initial statement to the police, he could not conclusively identify Adams as the shooter at trial. In fact, Jenkins testified he did not see who fired the shot that injured him; he could not testify that the person he was chasing, whom he believed had shot Gordon, was the same person who shot him. Gordon did not testify at trial. In summation, the evidence regarding who shot Jenkins was the pre-trial identification of Adams in a photo line-up and Jenkins' testimony at trial that he did not actually see who shot him. The only evidence of who shot Gordon was video evidence showing a person who resembled Adams firing a handgun.

The Commonwealth charged Adams with aggravated assault of both Jenkins and Gordon; the Commonwealth clearly believed Adams shot and

wounded both victims. However, the jury was not instructed that it was required to find Adams guilty or not guilty of both crimes. During deliberations, the jury asked to review the video evidence on three occasions, claiming they needed to see the videos again to help them identify the shooter. The request was denied each time.[1] The jury ultimately acquitted Adams of shooting Jenkins (the second shooting that occurred off camera) and could not reach a verdict regarding the shooting of Gordon (the first shooting that occurred on camera, but for which the victim did not testify).

On October 28, 2014, Adams filed a motion to dismiss the charges regarding Gordon based on collateral estoppel. A hearing on the motion was held on November 20, 2014. Adams raised the argument that based on the United States Supreme Court decision in **Ashe v. Swenson**, 90 S.Ct. 1189 (1970), the jury determined Adams was not the shooter of Jenkins and therefore Adams could not have been the shooter of Gordon. Accordingly, based upon collateral estoppel and double jeopardy, the Commonwealth was barred from re-litigating the identity of the perpetrator. The Commonwealth argued that there was independent proof of the identity of the shooter, and that while the Commonwealth theorized the same person had fired both sets

---

[1] The trial court believed reviewing video of the shootings would be unduly prejudicial to Adams.

of shots, a jury could rationally separate the two. Therefore, the Commonwealth claimed Adams could be retried for Gordon's shooting.

On December 8, 2014, the trial court granted Adams' motion based upon the doctrine of collateral estoppel as announced in **Ashe** and reiterated in Pennsylvania in **Commonwealth v. Smith**, 540 A.2d 246 (Pa. 1988).

Our applicable scope and standard of review are as follows: "Appellant's issue is a pure question of law. Therefore, our standard of review is *de novo,* and our scope of review is plenary." **Commonwealth v. Barger**, 956 A.2d 458, 461 (Pa. Super. 2008) (citation omitted).

**Commonwealth v. Smith**, **supra**, provides an excellent recitation of the rules for applying collateral estoppel in a criminal case.

> Collateral estoppel is "issue preclusion" which does not automatically bar subsequent prosecution but does bar redetermination in a second prosecution of those issues *necessarily* determined between the parties in a first proceeding which has become a final judgment. **Commonwealth v. Hude**, [492 Pa. 600] **supra** at 612, 617, 425 A.2d at 319, 322. It is a principle to be applied with "realism and rationality", not "with the hypertechnical and archaic approach of a 19th century pleading book." **Ashe v. Swenson**, **supra**, 397 U.S. at 444, 90 S.Ct. at 1194.

> We stated in **Hude**:

>> The approach set forth by the **Ashe** Court in determining the applicability of the principle of collateral estoppel where a previous judgment of acquittal was based upon a general verdict, is that we must:

>>> ... examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other

- 4 -

> than that which the defendant seeks to foreclose from consideration. ***Id.*** at 444, 90 S.Ct. at 1194.

> In determining "whether a rational jury could have grounded its verdict upon an issue other than that which" is sought to be foreclosed we are cautioned that "the inquiry 'must be set in a practical frame and viewed with any eye to all the circumstances.' " ***Id.*** at 444, 90 S.Ct. at 1194.

492 Pa. at 612, 425 A.2d at 319-20. In making this determination, we are guided by the federal decisions which employ a three-step approach in applying ***Ashe***:

> (1) An identification of the issues in the two actions for the purpose of determining whether the issues are sufficiently similar and sufficiently material in both actions to justify invoking the doctrine; (2) an examination of the record of the prior case to decide whether the issue was 'litigated' in the first case; and (3) an examination of the record of the prior proceeding to ascertain whether the issue was necessarily decided in the first case.

492 Pa. at 613, 425 A.2d at 320 (federal court citations omitted).

Finally, in ***Hude***, we interpreted 18 Pa.C.S.A. § 110 in a manner consistent with ***Ashe*** and the above principles, stating:

Section 110(2) states in pertinent part:

> § 110. When prosecution barred by former prosecution for different offense.

> Although a prosecution is for a violation of a different provision of the statutes than a former prosecution or is based on different facts, it is barred by such former prosecution under the following circumstances:

> ───────────

> (2) The former prosecution was terminated, after the indictment was found, by an acquittal ... which acquittal ... necessarily required a determination inconsistent with a fact which must be established for conviction of the second offense.

We therefore hold that *"necessarily required a determination"* is no more restrictive than "whether a *rational* jury could have grounded its verdict" without inclusion of the issue defendant seeks to exclude from relitigation.

**Commonwealth v. Smith**, 540 A.2d at 251.

More recently, in **Commonwealth v. States**, 938 A.2d 1016 (Pa. 2007), our Supreme Court expanded its explanation of how to apply collateral estoppel:

In the criminal law arena, the difficulty in applying collateral estoppel typically lies in deciding whether or to what extent an acquittal can be interpreted in a manner that affects future proceedings, that is, whether it "reflects a definitive finding respecting a material element of the prosecution's subsequent case." **Commonwealth v. Buffington**, 574 Pa. 29, 828 A.2d 1024, 1032 (2003). We ask whether the fact-finder, in rendering an acquittal in a prior proceeding, "could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." **Smith**, 540 A.2d at 251 (quoting **Hude**, 425 A.2d at 319-20 [**infra**]). If the verdict must have been based on resolution of an issue in a manner favorable to the defendant with respect to a remaining charge, the Commonwealth is precluded from attempting to relitigate that issue in an effort to resolve it in a contrary way. **See Commonwealth v. Zimmerman**, 498 Pa. 112, 445 A.2d 92, 96 (1981) (acquittal on simple assault precluded retrial on hung murder charges because simple assault was a constituent element of all grades of homicide in the case); **Commonwealth v. Wallace**, 411 Pa.Super. 576, 602 A.2d 345, 349-50 (1992) (Commonwealth's concession that the jury's acquittal meant appellant did not possess a gun collaterally estopped Commonwealth from any subsequent prosecution based on appellant's possession of a gun); **Commonwealth v. Klinger**, 264 Pa.Super. 21, 398 A.2d 1036, 1041 (1979) (appellant's acquittal on murder precluded the Commonwealth from bringing a subsequent perjury prosecution based on appellant's trial testimony that he did not kill the victim), *aff'd. sub nom.* **Commonwealth v. Hude**, 492 Pa. 600, 425 A.2d 313 (1980). Conversely, where an acquittal cannot be definitively interpreted

as resolving an issue in favor of the defendant with respect to a remaining charge, the Commonwealth is free to commence with trial as it wishes. *See Buffington*, 828 A.2d at 1033 (acquittal of rape and IDSI did not establish that Commonwealth failed to prove an essential element of sexual assault); *Smith*, 540 A.2d at 253-54 (acquittal of gun possession charge did not collaterally estop Commonwealth from proceeding on charges of murder and possession of an instrument of crime, as acquittal could have been based on any number of reasons); *Commonwealth v. Harris*, 400 Pa.Super. 12, 582 A.2d 1319, 1323 (1990) (robbery acquittal did not preclude retrial on hung charge of aggravated assault), *appeal denied,* 528 Pa. 621, 597 A.2d 1151 (1991).

*Commonwealth v. States*, 938 A.2d at 1021-22

With these instructions in mind, we turn to the instant factual scenario. The first and second prongs of the three prong federal test have been met – a new trial regarding the shooting of Gordon would be similar to the prior trial regarding the shooting of Gordon and Jenkins, and the issue of the identity of the shooter(s) was previously litigated. It is the third prong, whether the shooter of Jenkins and Gordon was necessarily the same, that is in question. Both the trial court and Adams believe that because the Commonwealth claimed the same person committed both crimes, the jury verdict exonerating Adams of shooting Jenkins necessarily exonerates him of having shot Gordon. On the other hand, the Commonwealth argues that although its theory was that the same person committed both crimes, it is possible that different people were responsible.

Our review of the certified record leads us to agree with the Commonwealth. As instructed by both the United States and Pennsylvania

Supreme Courts, we review the matter "in a practical frame and viewed with an eye to all the circumstances of the proceedings." **Smith**, at 251.

Both the trial court and Adams take the position that the Commonwealth is collaterally estopped from relitigating the identity of the shooter based on the belief that whoever shot Jenkins must be the same person who shot Gordon. Initially, we note that the Commonwealth and Adams sought to convince the jury there had been a lone gunman. Additionally, the trial court based its ruling on the presumption that there was a single perpetrator. If, in fact, the evidence left little room to doubt the fact of a lone gunman, then the application of collateral estoppel to the instant matter would be the reasonable and proper result. Logically, if only one person fired a gun at the fight scene, and a jury determined Adams was not that person in one instance, he could not be that person in the other instance. The central issue of the identity of the lone shooter having been resolved, the Commonwealth would not be allowed a second bite at that apple. However, although the parties and trial court all *theorized* there was a single shooter, for collateral estoppel to apply we must determine if the evidence presented at trial essentially *required* there be a single shooter. Our independent review of the evidence presented at trial leads us to conclude the jury could have rationally determined there was more than one assailant at the Travelers Motorcycle Club on the night in question.

First, we note that the jury was allowed to consider each shooting separately. The jury was never charged that it had to reach the same

- 8 -

determination regarding the assaults Jenkins and Gordon and was presented with separate verdict sheets; one regarding Jenkins, the other Gordon.[2] This is important because we cannot initially conclude the jury was of a mindset that the evidence and reasoning regarding Jenkins' assault must also apply to the assault of Gordon. The evidence of the case did not show one person shooting Gordon and then immediately turning and shooting Jenkins. Rather, the evidence presented at trial showed two shootings separated by both time and distance. This separation of shootings, admittedly brief, in both time and space, rationally allows for the possibility of more than one shooter.

Next, the possibility that the jury could rationally separate the shootings is supported by Adams' assertion that the circumstances attendant to the shootings were ripe for misidentification. In closing argument, Adams' trial counsel specifically stated:

> When you look at the video, and the people leaving the actual driveway, Mr. Shields [the prosecutor] wants you to believe that Mr. Adams is the guy being dragged out. But these two women [witnesses for Adams], they're unequivocal. They put themselves in the middle of this. You know, bikers, and remember what Mr. Jenkins said, it's not just the Wheels of Soul there, there's also the Jay Hawkers, and he said many more. Many more clubs. When you saw that melee out front you didn't see one or two or three people, you saw a cluster of people, you

---

[2] The verdict sheet as to the assault of Jenkins is not in the certified or reproduced record. On the verdict sheet in which Gordon is identified as the victim of the aggravated assault charge and lists seven charges, the jury wrote "Unable to reach a verdict" next to each charge.

saw a cluster. You saw people wearing jackets you can't even tell the insignia on the jackets. You can't even tell what colors they are, what club they're from. This is not an open and shut case. It's not hey, there was an incident at the bar, obviously that one incident, as a man is leaving with three females, did that trigger someone to come back and start shooting? In fact, Trina Gillard tells you that the original guy that had words with John Adams, she didn't even see out there. There's about 15 people in that video, members of the jury, and we see multiple people swinging at each other. It's your eyes that matter.

N.T. Trial 9/18/2014, at 150-151.

Clearly, Adams wanted the jury to believe Jenkins, the only victim to testify, was mistaken in his initial identification of Adams as the person who shot him. As noted above, both the Commonwealth and Adams wanted to convince the jury the same person committed the shootings; they only differed in the identity of that person. However, just because both parties theorized only one person acted criminally does not mean that the evidence presented necessitated that determination.

As argued in closing on behalf of Adams, there was a melee at the time of the shooting. Although Adams' argument of a confused scene and mistaken identity assumed a single shooter, there is no logical reason why that confusion could not extend to the number of shooters. At trial, Jenkins testified he did not see who shot him. Logically, that also means he could not say the person who shot him was the same person who shot Gordon. Additionally, the portion of the closing argument quoted above suggests any number of people could have been the shooter. Based upon the scenario

argued by Adams, we see no reason why a jury could not rationally believe different people were responsible for shooting Jenkins and Gordon.

Finally, the evidence presented at trial also allows for the possibility of two shooters. We note that Jenkins' testimony provided the jurors with ample reason to doubt his initial claim Adams shot him. As we discussed above, at trial Jenkins testified that he did not see who shot him, but that that he chased after the person he **believed** had shot Gordon. This failure to positively identify the person who shot him as the same person who shot Gordon, togther with the lack of video evidence of the Jenkins shooting, leaves a gap in the evidence and rationally allows the jury to separate the two shootings.

Further, Jenkins' testimony at trial regarding the shooting was remarkably vague. For example:

> Q [By the Commonwealth]: Among the people being bounced out of the Club, are any in Court here today?
>
> A: No.
>
> Q: No, you are not sure?
>
> A: I am not sure.

N.T. Trial, 9/16/2014, at 31.

> A: I was looking across the street, now I am paranoid and I seen someone walking across the alleyway, across the street. I didn't get a good look at him. It is dark and I seen someone grabbing something. The next thing I know, I am blanking out – I am seeing something being pulled out.
>
> Q: Could you tell if it was a gun?

- 11 -

A: Not at first.  Then I realized it was a gun.

*Id*. at 33

Q: And the person that came back and started firing, is this one of the people involved in the fight?

A: I don't know, sir.  I am saying at the time I am starting to blank out and having flashbacks.

Q: At that time or now?

A: Right now I am having flashbacks.

*Id*. at 34.

Q: [Reading to Jenkins his prior statement to the police] How sure are you the male was shooting in the parking lot of 2063 Ridge is the same person kicked out of the Club earlier? Answer: I am positive.

A: Yes.

Q: Was that accurate at the time?

A: To be honest I don't know how to answer that.  The only thing I seen was clothes and the gun.  I was not looking at the guy fighting.  Whoever had a gun was shooting at me.

\*\*\*

Q: Question: Can you describe the person that shot you? Answer: I really didn't see who was shooting.  When I got hit, I heard the shots coming from the area where the guy I saw was running coming from outside of the gate.  I never made it out of the gate when I was shot.  Do you remember that?

A: Yes.

*Id*. at 45-46.

Q [Again questioning Jenkins regarding his prior statement]: Can you identify the male that was shooting inside of the parking lot

of 2063 Ridge Avenue? I think I can if I saw him again. Do you remember that?

A: Yes.

Q: Was that accurate?

A: In my best knowledge. I don't know.

*Id*. at 49.

On cross-examination, Jenkins continued his vague testimony regarding the identity of the shooter.

Q: Mr. John Adams, is he the gentleman who shot you that night?

A: I don't know for sure. I am still trying to find out myself.

Q: Do you remember seeing him that night?

A: He looks familiar.

Q: He looks familiar. He looks like the gentleman that was being escorted out?

A: I really didn't get a good picture that night of the face. Somewhat the clothing.

Q: And the body type?

A: That is why I am confused if this is the man that did the shooting.

*Id*. at 67.

Finally,

Q [Regarding Jenkins' prior testimony at the preliminary hearing]: And at that time you were under oath, you told both the DA, defendant's counsel and the judge that Mr. Adams was not the person that shot you; is that correct?

A: I am saying the same thing I said before. I don't remember if it is him or not. If that is the same thing. I don't know if that is him or not.

*Id*. at 80.[3]

Given the fact that there was no direct video evidence as to who shot Jenkins, coupled with his reluctant trial testimony, it is not surprising the jury acquitted Adams of shooting Jenkins. When Jenkins' testimony is reviewed in light of Adams' own argument that any number of other people at the scene might have been armed, it raises the distinct possibility of more than one shooter.

Finally, we need to look at the nature of the evidence against Adams and the shooting of Gordon. During deliberations the jury repeatedly requested it be allowed to view either the video or the still pictures taken from the video. We quote the jury's final message to the court:

Without reviewing the surveillance video and/or still images, the jury will be unable to come to a unanimous decision on the charges relating to the shooting of Gregory Gordon. Further deliberations without reviewing those materials will not be productive.

Jury Question #8, 9/19/2014.

_____

[3] We are aware that Jenkins identified Adams as his shooter in his prior statement to the police. This statement supports the reasoning that there was a single shooter. However, we must examine the contrary trial testimony to determine whether the jury could have reasonably concluded there was more than one shooter.

We believe this is clear evidence the jury was considering the shootings separately and evaluating the nature and quality of the evidence as to each alleged victim. Given the uncertain identification testimony of Jenkins and the inability of the jury to review the photographic evidence during deliberations, we believe it was reasonable for the jury to acquit Adams of shooting Jenkins yet be unable to reach a verdict with respect to Gordon.

In light of the above, we do not believe Adams' acquittal of shooting Jenkins necessarily determined Adams did not shoot Gordon. Accordingly, the trial court erred in granting Adams' motion to bar retrial on the basis of collateral estoppel.

Order vacated. This matter is remanded to the trial court for action consistent with this decision. Jurisdiction relinquished.

Judge Musmanno joins in the memorandum.

President Judge Emeritus Ford Elliott concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>6/7/2016</u>