425 A.2d 313

COMMONWEALTH of Pennsylvania, Appellee,

v.

Manfred HUDE, Appellant.

COMMONWEALTH of Pennsylvania, Appellee,

v.

Dennis KLINGER, Appellant.

Supreme Court of Pennsylvania.

Argued May 20, 1980.

Decided Oct. 31, 1980.

Reargument Denied Feb. 18, 1981.

602

604

William C. Costopoulos, Lemoyne, Shaubut C. Walz, Newpark, for appellant Klinger.

C. Joseph Rehkamp, Dist. Atty., Donald L. Reihart, Sp. Asst. Atty. Gen., for the Commonwealth.

606

Thomas A. Wallitsch, Public Defender, Carole K. McGinley, Appellate Public Defender, Thomas F. Traud, Jr., Acting Public Defender, for appellant Hude.

Scott K. Oberholtzer, Richard R. Tomsho, Asst. Dist. Attys., for appellee.

## OPINION

NIX, Justice.

These two appeals present the same question of law: may a defendant be tried for perjury arising out of statements he made in a prior trial in which he was acquitted of the charges brought against him? We have consolidated these appeals to address this common issue.

## I. PROCEDURAL HISTORY

### Hude Appeal

Appellant, Manfred Hude, was charged with twenty counts of possession and delivery of marijuana and one count of corruption of a minor. The charges arose out of a series of sales of marijuana to the same individual which were alleged to have occurred between October 1974 and January 1975. Nine of the possession and delivery counts were dismissed before trial. In June 1975, the Commonwealth brought Hude to trial on three of the remaining possession and delivery charges and on the corruption charge. The Commonwealth's evidence consisted solely of the testimony of Barry Hagemus who asserted that on numerous occasions during the fall and winter of 1974–1975, Hude had sold him varying amounts of marijuana. The jury acquitted Hude of all charges.

During the course of the trial Hude was questioned by his attorney as follows:

Q: Were you ever dealing drugs?

A: No.

On July 15, 1975, the Commonwealth charged Hude with perjury based on this statement. At the perjury trial, the Commonwealth again called Barry Hagemus who testified to the alleged purchases of marijuana from Hude. The trial judge, sitting without a jury, found Hude guilty of perjury.[1]

---

1. Prior to the perjury trial, the Commonwealth went to trial on the remaining eight possession and delivery charges. Hude was convicted of seven counts and acquitted of one. On appeal, the Superior Court reversed *Commonwealth v. Hude*, 256 Pa.Super. 439, 390 A.2d

In both the trial on the substantive issue and the subsequent perjury trial the Commonwealth relied exclusively on the testimony of Barry Hagemus who, in each instance, related that he would meet Hude at prearranged locations where the transfers of marijuana and money took place. In each instance Hude insisted that he had no involvement with Barry Hagemus.

Hude appealed the perjury conviction to the Superior Court contending that the perjury prosecution violated the double jeopardy clause and the principle of collateral estoppel. The Superior Court affirmed on the basis of *Commonwealth v. Klinger*, 264 Pa.Super. 21, 398 A.2d 1036 (1979); *Commonwealth v. Hude*, 267 Pa.Super. 133, 406 A.2d 554 (1979). We granted appellant's petition for allowance of appeal.

### Klinger Appeal

Appellant, Dennis Klinger, was charged with the murder of his mother. The Commonwealth's case against him was entirely circumstantial, there being no eyewitnesses to the killing. The death was determined to have been caused by asphyxiation that resulted from dirt being forced into her mouth and lungs.

Following the eight-day trial, during which over thirty witnesses testified, Klinger was acquitted. Eight months later, Klinger was charged with various counts of perjury, false swearing and conspiracy to commit perjury. The perjury charges, all of which emanated from Klinger's trial testimony, can be summarized as follows:

*Count I*—charges appellant lied when he stated on cross-examination that he did not kill his mother and does not know who killed her, the count averring that appellant did kill his mother.

183 (1978). In that appeal Hude also alleged a violation of the double jeopardy clauses of the federal and state constitutions and section 110 of the Crimes Code, 18 Pa.C.S.A. § 110. These issues were not addressed by the Superior Court since they granted relief because of the introduction of evidence of crimes unrelated to those listed in the indictments. *Id.*, 256 Pa.Super. at 440 n. 1, 390 A.2d at 183, n. 1.

*Count II* —charges appellant lied when he stated on direct that he saw and waved to "two guys" on Lambs Gap Road after leaving Millers Gap, the count averring he never saw them that morning.

*Count III* —charges appellant lied when he stated on direct that the last time he saw his mother was when he lost sight of her on Millers Gap and doubled back to the car, the count averring that the last time he saw his mother was when he struck her.

*Count V* —charges appellant lied when he stated on cross that one Nielson was the first person to whom he related the events of Millers Gap, the count averring that petitioner had earlier told one Sue Ann Guise that he had struck his mother and left her on the mountain.

*Count VI* —charges appellant lied when he detailed the route taken with his mother from Camp Hill to the mountain, the count averring the two had stopped at a manufacturing plant to ask about employment.

*Count VII* —charges appellant conspired with his defense attorney to commit the foregoing crimes of perjury.[2]

A motion to dismiss, contending the prosecution is barred by double jeopardy and collateral estoppel, was denied. Klinger appealed to the Superior Court which reversed the lower court's order directing that Klinger be tried on Count I and that part of Count VII relating to Count I. *Commonwealth v. Klinger, supra.* The court affirmed in all other respects and remanded for trial. We granted the petition for allowance of appeal and consolidated this case with *Commonwealth v. Hude* for argument and disposition.

## II. DISCUSSION

To place in proper perspective the question we are called upon to resolve, it is necessary to identify the conflicting considerations inherent in a prosecution of a former defendant for alleged perjury during his earlier criminal trial. One possibility is that an overzealous prosecutor may be using the perjury trial to retry issues already litigated and deter-

---

**2.** Count IV was dismissed at the preliminary hearing.

mined in the defendant's favor. Another possibility, where the defendant was convicted in the trial for the substantive offense, is that the subsequent perjury charge may be used to increase his punishment. On the other side of the ledger is the real concern that a blanket bar of perjury proceedings against defendants for their testimony in their criminal trials would encourage false testimony by defendant-witnesses and thereby subvert objective factfinding. It may also be that an absence of the perjury sanction against such witnesses, once that fact becomes known, will cause a dilution of the weight of this testimony.[3]

In this context we turn to the question of the applicability of the double jeopardy protection of the federal and state constitutions to the problem. In terms of the traditional aspects of double jeopardy, freedom from the harassment of successive trials and the prohibition against double punishment, courts have generally concluded that the crime of perjury is not the same offense as the crime for which the defendant was prosecuted at the first trial. *United States v. Williams*, 341 U.S. 58, 62, 71 S.Ct. 595, 597, 95 L.Ed. 747 (1951); *Commonwealth v. Hilton*, 265 Pa. 353, 355, 108 A. 828 (1919) (dictum). In determining whether two indictments charge the same offense, many of the courts have used variants of the "same evidence" test, *Diaz v. United States*, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1911); *Pennsylvania v. Ramunno*, 219 Pa. 204, 68 A. 184 (1907); *Commonwealth v. Shoener*, 216 Pa. 71, 64 A. 890 (1906), *cert. denied*, 207 U.S. 188, 28 S.Ct. 110, 52 L.Ed. 163 (1907) (Superior Court opinion), while others have employed various interpretations of the "same transaction" test. *Spannell v. State*, 83 Tex.Crim. 418, 203 S.W. 357 (1918); *Harris v. State*, 193 Ga. 109, 17 S.E.2d 573 (1941); *State v. Houchins*, 102 W.Va. 169, 134 S.E. 740 (1926); *State v. Greely*, 30

3. It is interesting to note that most civil law countries have avoided this dilemma. They generally require a defendant to testify in his own behalf, but protect him from prosecution for perjury by not requiring that an oath be administered to him. *See* Note, Perjury by Defendants: The Uses of Double Jeopardy and Collateral Estoppel, 74 Harv.L.Rev. 752 (1961); Silving, The Oath: II, 68 Yale L.J. 1527, 1533–35 (1959).

N.J.Super. 180, 103 A.2d 639 (1954). While the legitimacy of the various tests may be suspect, it appears that there has been a consensus that the protections against successive trials and double punishment have been deemed not to require the invocation of the double jeopardy bar in these perjury prosecutions. *United States v. Williams*, 341 U.S. 58, 62, 71 S.Ct. 595, 95 L.Ed. 747 (1951).

With the U.S. Supreme Court's decision in *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) an added dimension has been given to the federal double jeopardy protection.[4] In *Ashe* the Court held that collateral estoppel is a part of the Fifth Amendment's guarantee against double jeopardy and is applicable to the states through the Fourteenth Amendment under *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). The differences between collateral estoppel and the traditional aspects of double jeopardy, successive trials and double punishment, are particularly important to our inquiry. First, collateral estoppel does not require that the offenses

4. The historical development of the need for the doctrine of collateral estoppel was set forth in *Ashe* as follows:

Until perhaps a century ago, a few situations arose calling for its application. For at common law, and under early federal criminal statutes, offense categories were relatively few and distinct. A single course of criminal conduct was likely to yield but a single offense. See Comment, Statutory Implementation of Double Jeopardy Clauses: New Life for a Moribund Constitutional Guarantee, 65 Yale L.J. 339, 342. In more recent times, with the advent of specificity in draftsmanship and the extraordinary proliferation of overlapping and related statutory offenses, it became possible for prosecutors to spin out a startingly numerous series of offenses from a single alleged criminal transaction. See Note, Double Jeopardy and the Multiple Count Indictment, 57 Yale L.J. 132, 133. As the number of statutory offenses multiplied, the potential for unfair and abusive reprosecutions became far more pronounced. Comment, Twice in Jeopardy, 75 Yale L.J. 262, 270–280; Note, Double Jeopardy and the Concept of Identity of Offenses, 7 Brooklyn L.Rev. 79, 82. The federal courts soon recognized the need to prevent such abuses through the doctrine of collateral estoppel, and it became a safeguard firmly embedded in federal law. See n. 7, supra. Whether its basis was a constitutional one was a question of no more than academic concern until this Court's decision in *Benton v. Maryland*, supra.

*Id.* 397 U.S. at 445, n. 10, 90 S.Ct. at 1195, n. 10.

charged in the two prosecutions be the same. Second, collateral estoppel only bars a redetermination of those issues necessarily determined between the parties in the first proceeding. Third, collateral estoppel requires a final judgment in the first proceeding. Thus it becomes clear that while the traditional aspects of double jeopardy could readily be deemed inapplicable to a subsequent perjury prosecution of a criminal defendant, such is not the case with collateral estoppel. As the *Ashe* Court noted, collateral estoppel was intended to enhance the traditional double jeopardy protection and to provide relief from the growing threat of multiple prosecutions. To that end that Court directed the principle of collateral estoppel be applied with "realism and rationality" and not "applied with the hypertechnical and archaic approach of a 19th century pleading book." *Id.* at 444, 90 S.Ct. at 1194.

The approach set forth by the *Ashe* Court in determining the applicability of the principle of collateral estoppel where a previous judgment of acquittal was based upon a general verdict, is that we must:

... examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration. *Id.* at 444, 90 S.Ct. at 1194.

In determining "whether a rational jury could have grounded its verdict upon an issue other than that which" is sought to be foreclosed we are cautioned that "the inquiry 'must be set in a practical frame and viewed with any eye to all the circumstances.'" *Id.* at 444, 90 S.Ct. at 1194. No doubt is left that the Court did not intend to allow the collateral estoppel aspect of double jeopardy protection to be illusory in criminal proceedings where the first judgment ended in an acquittal. To indulge in labored mental gymnastics in an attempt to avoid the bar under this test is contrary to the express mandate of *Ashe.*

Federal decisions have suggested the following three step approach in applying the *Ashe* standard:

(1) An identification of the issues in the two actions for the purpose of determining whether the issues are sufficiently similar and sufficiently material in both actions to justify invoking the doctrine; (2) an examination of the record of the prior case to decide whether the issue was 'litigated' in the first case; and (3) an examination of the record of the prior proceeding to ascertain whether the issue was necessarily decided in the first case. *United States v. Hernandez*, 572 F.2d 218, 220 (9th Cir. 1978); *United States v. Dipp*, 581 F.2d 1323, 1325 (9th Cir. 1978), *cert. denied*, 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979); *United States v. Sarno*, 596 F.2d 404, 408 (9th Cir. 1979).

There is a suggestion by the dissent in the Superior Court that "state statutory collateral estoppel," *see* 18 Pa.C. S.A. § 110(2), provides less protection than the federal constitutional requirement of that aspect of double jeopardy. *Commonwealth v. Klinger*, 264 Pa.Super. 21, 398 A.2d 1036, 1042–44 (1979) (Dissenting Opinion, Hoffman, J.)[5] We do not accept this restricted interpretation of section 110(2). The language of Article 1, section 10 of the Pennsylvania Constitution is essentially identical to the federal double jeopardy clause. "In light of the textual and policy similarities between the Pennsylvania and United States constitutional provisions" we have concluded that since *Benton v. Maryland, supra,* the Pennsylvania clause must be interpreted as being at least co-extensive with its federal counterpart. *See Commonwealth v. Klobuchir*, 486 Pa. 241, 254, 405 A.2d 881, 887 & n. 12 (1979) (Nix, J., Opinion in Support of Affirmance joined by O'Brien and Larsen, JJ.). Thus a concession that section 110(2) did not comport with the minimum protection afforded by the federal constitutional standard in this regard is in turn a determination that section 110(2) is not in compliance with the minimal constitutional requirement of our own constitutional provision. Particularly where the language of the statute does not force

**5.** Judge Hoffman based his dissent on the majority's failure to distinguish between what he perceived to be the limitation of "state statutory collateral estoppel" and the federal constitutional standard.

such a result, we are required to reject an interpretation that would create a conflict with applicable constitutional provisions. 1 Pa.C.S.A. § 1922(3) (Supp.1964–79). Section 110(2) states in pertinent part:

§ 110. When prosecution barred by former prosecution for different offense

Although a prosecution is for a violation of a different provision of the statutes than a former prosecution or is based on different facts, it is barred by such former prosecution under the following circumstances:

\* \* \* \* \* \*

(2) The former prosecution was terminated, after the indictment was found, by an acquittal or by a final order or judgment for the defendant which has not been set aside, reversed or vacated and which acquittal, final order of judgment necessarily required a determination inconsistent with a fact which must be established for conviction of the second offense.

We therefore hold that *"necessarily required a determination"* is no more restrictive than "whether a *rational* jury could have grounded its verdict" without inclusion of the issue defendant seeks to exclude from relitigation. Approaching section 110(2) "with realism and rationality" we are satisfied that it can be brought into compliance with constitutional double jeopardy requirements. Moreover, even if we were to accept the premise that the language of section 110(2) forces the conclusion that it is confined to "ultimate" issues of fact, that judgment would be of no consequence.[6] Both the federal and the state constitutions require more and their dictates must be satisfied. *Parker.v. Children's Hospital of Phila.*, 483 Pa. 106, 116, 394 A.2d 932

6. We note further that the "ultimate" versus "evidentiary" dichotomy is not as well defined as might be suggested. Various definitions of "ultimate" fact have been suggested, ranging from "those facts, upon whose combined occurrence the law raises the duty, or the right, in question," *The Evergreens v. Nunan*, 141 F.2d 927, 928 (2d Cir. 1944) (L. Hand, J.) to those whose "determination ... was a necessary step in arriving at the final judgment." Developments in the law—*Res Judicata*, 65 Harv.L.Rev. 818, 843 (1952).

(1978); *Singer v. Sheppard,* 464 Pa. 387, 393, 346 A.2d 897 (1975); *Glancey v. Casey,* 447 Pa. 77, 88, 288 A.2d 812 (1972).

## III. *Analysis—Hude Appeal*

No scenario would be more likely to suggest the specter of overzealous prosecution than the circumstances surrounding Mr. Hude's conviction. This appeal arises from the arrest of appellant which resulted in indictments charging twenty counts of possession and delivery of drugs on twenty separate days as a result of a series of sales to the same individual.[7] That individual, Barry Hagemus, a self-confessed drug seller, was the sole witness offered by the Commonwealth to prove these alleged transactions. Three of the possession and delivery charges were dismissed following the preliminary hearing. Prior to the initial trial, in a proceeding in the nature of habeas corpus contesting the committing magistrate's prima facie determination, six other counts were dismissed by stipulation of counsel. The Commonwealth proceeded to trial on three of the counts charging possession and delivery and the one count of corrupting the morals of a minor. Appellant was acquitted on all charges by the jury. The Commonwealth thereafter went to trial on the remaining counts, over appellant's objection. In this second trial appellant was convicted of some of these charges and after appeal, those convictions were reversed by the Superior Court.[8] Again in the second trial the Commonwealth relied upon the testimony to Hagemus to establish the transactions. Finally in the perjury case, the Commonwealth charged that appellant made three false statements during the first trial. It was contended that he lied: (1)

7. As stated in the initial recitation of facts, appellant was also charged with one count of corruption of a minor, obviously premised upon the fact that Hagemus was a minor during the period he claims that he was supplied these drugs by appellant.

8. The propriety of the second trial is not now before us. *See* n. 1. In passing, we note that the second prosecution would appear to raise serious questions under section 110 of the Crimes Code, 18 Pa.C.S.A. § 110 and *Commonwealth v. Campana (I),* 452 Pa. 233, 304 A.2d 432, vacated 414 U.S. 808, 94 S.Ct. 73, 38 L.Ed.2d 44 (1973), reinstated, 455 Pa. 622, 314 A.2d 854 *(Campana II),* cert. *denied,* 417 U.S. 969, 94 S.Ct. 3172, 41 L.Ed.2d 1139 (1974).

when he stated he owned a certain car; (2) when he stated that he never dealt in drugs; and (3) when he stated he did not have a specified car during a particular period of time. The perjury complaint was heard without a jury. A demurrer was sustained as to the first averment and appellant was found not guilty of the third averment. It is the conviction of the second averment that is presently before us. From this recitation it is evident, even before applying the *Ashe* analysis, that the Commonwealth was determined to convict appellant on the basis of the testimony of Hagemus.

In identifying the issue it must be stressed that at Hude's substantive trial it was simply a question of oath against oath. Hagemus testified to a number of meetings during which the contraband was allegedly transferred. The defendant denied agreeing to sell or selling drugs to Hagemus. There was no question of misidentification nor was it possible to reconcile the conflicting versions. The jury was forced either to accept Hagemus' testimony or to acquit. They followed the latter course. Thus the critical, in fact the sole issue litigated at the first trial was the credibility of Hagemus, and the jury resolved that issue against the Commonwealth.

When we carefully scrutinize the perjury action we find that it was no more than a thinly veiled attempt to retry the issue of Hagemus' credibility. The Commonwealth argues in its brief:

> The jury in the drug trials had to determine whether or not the drug transfers took place between Appellant and Barry Hagemus on eleven (11) days in particular. Does it follow logically, as Appellant suggests, that since he was found not guilty of the drug charges in the first trial, then all subsequent juries would be obligated forever to value his testimony more than that of any Commonwealth witness?

Obviously, the answer to this rhetorical question as framed is no. However, the significant factors the question fails to incorporate are that it was the same witness repeating the same testimony before a second jury. Nor are we

concerned with Hagemus' credibility in other areas or against other defendants. The only question is whether the original jury's resolution of the issue of Hagemus' credibility as to the subject matter testified to during the original trial was conclusive as to this appellant, thereby foreclosing it from further litigation in the subsequent proceeding, against this appellant.

The Commonwealth makes the fallacious argument:

The concept of collateral estoppel is designed to protect an accused from prosecutorial harassment. The constitutional doctrine is intended to prevent prosecutors from retrying acquitted defendants with the same evidence. It cannot be argued that Appellant was subjected to such conduct, because the record shows clearly that the testimony of Officers Batz and Wass offered to corroborate the testimony of the Commonwealth's main witness, Barry Hagemus, at the perjury trial could have been properly presented only for the first time at that trial.

To be more accurate, collateral estoppel is issue preclusion. *Ashe v. Swenson, supra,* 397 U.S. at 444, 90 S.Ct. at 1194; *Commonwealth v. Peluso,* 481 Pa. 641, 393 A.2d 344 (1978); *United States v. Nash,* 447 F.2d 1382 (4th Cir. 1971). It seeks to prevent the relitigation of a finally litigated issue in a subsequent proceeding between the same parties whether the same or different evidence is to be introduced. Our perjury statute requires that proof of the falsity of a statement must be corroborated. 18 Pa.C.S.A. § 4902(f). This may be accomplished by the direct testimony of two witnesses or by direct testimony of one witness plus corroborating evidence. *Commonwealth v. Broughton,* 257 Pa.Super. 369, 390 A.2d 1282 (1978); *Commonwealth v. Field,* 223 Pa.Super. 258, 298 A.2d 908 (1972). As the above quoted argument of the Commonwealth indicates, they chose to offer Hagemus' testimony as the direct evidence of the falsity and the two officers' testimony in corroboration. Hagemus' testimony was offered to establish the falsity. It was the same as that offered before the original jury. Thus the factfinder in the perjury charge was required to accept the same testimony

which the original tribunal had rejected. If collateral estoppel is applicable and the issue has been deemed to be foreclosed, the fact that additional corroboration may be available is of no consequence. *Commonwealth v. Peluso, supra; Wingate v. Wainwright,* 464 F.2d 209 (5th Cir. 1972). Thus the additional fact of corroboration in the perjury action is not determinative; what is controlling is that the direct evidence of the falsity produced in the perjury trial was the same evidence that was rejected in the original trial.[9]

Approaching our analysis in terms of the suggested three step approach our differences with views expressed by the Commonwealth and adopted by a majority of the Superior Court become clear. The ultimate issue of fact to be proven in the original trial was that Hude possessed and delivered to Hagemus drugs at specified times. The sole evidentiary basis offered to establish that question was the testimony of Hagemus. Since Hagemus' testimony was the sole evidentiary basis for the charges, his credibility was the *only* issue contested in the trial and presented to the jury for resolution. Thus the issue of Hagemus' credibility was not only "material" in the first trial, it was critical; it was also unquestionably "litigated," being the only question in dispute; and, it was "necessarily decided" adverse to the Commonwealth by the verdict.

The ultimate issue of fact sought to be proven in the perjury proceeding was whether appellant knowingly lied when he answered in the negative the question posed by his counsel.[10] If we were to freeze our analysis at this point we

9. The testimony of the two police officers did not directly touch upon those incidents testified to by Hagemus but referred to totally unrelated incidents. Neither officer's testimony could establish actual involvement in drugs by appellant but only suggested the possibility of his involvement.

10. Predicating a perjury prosecution on the embellishment of counsel which forced the defendant to answer in the negative or to virtually forfeit any chance of acquittal for the specific offenses charged, gives credence to the criticism of our system that: a system which punishes defendants for testifying untruthfully when the truth would be to their disadvantage is both unrealistic and subject to abuse.

would have to agree that there was not a sufficiently similar and material issue in both actions to make the doctrine of collateral estoppel applicable. The difficulty with this resolution is that to stop the analysis at this point fails to "set [the inquiry] in a practical frame and viewed with an eye to all the circumstances." *Ashe v. Swenson, supra,* 397 U.S. at 444, 99 S.Ct. at 1194. In this case the perjury trial has been completed and we have the record before us. A review of that record establishes that the proof of the falsity of the answer depended upon the acceptance of Hagemus' testimony that appellant was dealing in drugs. To look only to the "ultimate" issue of fact and assess its dissimilarities with the issues in the original trial and ignore the factual predicate upon which that "ultimate" issue of fact must rest would be the "technically restrictive" approach that *Ashe* instructs us not to follow. The concern that application of the doctrine to "evidentiary" issues rather than confining it to "ultimate" issues of fact makes it more difficult to ascertain that each evidentiary issue was necessarily adjudicated in the original acquittal is not present here where that issue was the only one to be resolved. Thus, in this instance, there is no rational basis to insist upon a distinction between "evidentiary" and "ultimate" and we refuse to adhere to a rule in instances where the reasons for its application are not present. *See, United States v. Sarno, supra; United States v. Hernandez, supra; United States v. Nash, supra; United States v. Drevetzki,* 338 F.Supp. 403 (N.D.Ill.1972).

We also reject the suggestion that we should limit our interpretation of the original jury's verdict as merely evidencing the jury's disbelief that Hagemus sold or delivered drugs on the specific days and places set forth in the indictments in that case and not to accept it as a general repudiation of Hagemus' testimony. In his testimony during the first trial, as he did on each occasion where he was called for the Commonwealth, Hagemus' testimony consisted of a full explication of his alleged knowledge of Hude's "dealing ...". At the time the first trial commenced, there were a number of indictments covering the testimony that

was given during the first trial.  The Commonwealth elected to proceed only on three of these sale and delivery indictments.  It is reasonable to assume that the Commonwealth selected the strongest cases in its first attempt to convict.  The defense was a general denial of the course of conduct rather than a specific response to one or more of the dates set forth in the indictments to which appellant was then being called upon to answer.  Approaching the record of the first perjury trial with the realism and rationality we are required to employ, we can find no basis for singling out or isolating facts to suggest the jury may have rejected only that on the three dates in the indictments before them, appellant was not engaged in dealing and selling but did engage or deal and sell drugs.  To the contrary, the indications are that the first jury's repudiation of the testimony of Hagemus was complete.  We note that in the second trial the jury did convict on some counts and acquit on others.  In that posture, the Commonwealth's argument would have much more substance.  However, our concern in this appeal is the finding of the *original jury* which rejected all of the three indictments they were presented with.

Finally, we also note that in the first trial the jury had before them the indictment charging corrupting the morals of a minor.  The minor referred to in that indictment was, of course, the witness, Hagemus, who was 16 at the time of the alleged occurrence of this series of events.  If the jury had, as the Commonwealth suggests, concluded that Hude was in fact dealing in drugs and dealt in drugs with this young boy but not on the occasions in the indictments before them, the jury could have returned a verdict of corrupting the morals of a minor, although acquitting as to the specific charges of sale and delivery.  This they did not do, which is further evidence of the total rejection of the testimony of Hagemus.  The Commonwealth attempts to respond to the failure of the jury to make a finding of guilt on the corrupting charge by suggesting that the jury may have acquitted because they believed that the witness, Hagemus, "was already corrupt."  While this is a possibility, it is the

kind of labored reasoning that the *Ashe* Court referred to as "the hypertechnical and archaic approach of a 19th century pleading book." In that instance, the corrupting count was clearly an umbrella charge which was intended to fill the gaps if the Commonwealth's proof failed as to the specific averments. Its rejection indicates the total discredit of the Commonwealth's case by the jury. Moreover, the Commonwealth's argument that the jury concluded that Hagemus was already corrupted further supports the view that they totally rejected all of his testimony.

▪ We are satisfied that a fair reading of this record demonstrates that during the first trial the jury did "litigate" the question of Hagemus' credibility as to his alleged knowledge of Hude's drug dealings and found that testimony to be wanting. It was not rejected in part; it was rejected fully; and, for that reason, we feel that collateral estoppel can properly be invoked to prevent the relitigation of that issue. Therefore, the Order of the Superior Court affirming the Judgment of Sentence entered in the perjury case is reversed; the Judgment of Sentence is vacated, and the appellant is discharged.

## IV. *Analysis—Klinger Appeal*

In reviewing the record in this appeal, the undisputed testimony during the trial indicated that appellant walked into the West Shore Youth Counseling Center in Camp Hill at approximately 7:20 a. m. on Friday, May 28, 1976, and he met Vincent O'Reilly, a counselor. Klinger apparently told O'Reilly that he wanted to turn himself in to his parole officer because he had been in violation of the terms of his parole.[11] Appellant called his mother from O'Reilly's office and asked her to pick him up at a nearby shopping center and to drive him to his parole officer. The deceased, Hazel Pulaski, was seen meeting Klinger in her brown Pinto at the shopping center at approximately 7:40 a. m. and the two

11. Klinger had served 4 months in jail for forging several of his mother's checks and had been paroled in April 1976. It appears that he believed that he was in violation of that parole.

drove away from that location together. At approximately 9:15 a. m., Klinger arrived at the house of his friend, Carole Durkin, in Camp Hill, without his mother. He arrived at Ms. Durkin's house in his mother's car. Mrs. Pulaski, appellant's mother, was found dead ten days later in a remote mountainous area at Lambs Gap. It was stipulated by counsel and the jury was advised that if Klinger murdered his mother, that act would have occurred within the period between 7:40 a. m. and 9:15 a. m. on May 28, 1976. The disputed trial focused upon the events that occurred during that time frame between 7:40 a. m. and 9:15 a. m.

The Commonwealth proceeded on the theory that Klinger and his mother drove to Lambs Gap where he killed her and left her facedown near a small stream. It was contended that he then drove to the home of Carole Durkin where he spent the remainder of the morning. That evening Klinger drove to the Maryland shore with his girlfriend, Allyson Weiss, where the two remained until Monday evening, May 31. By that time, search efforts had begun for Mrs. Pulaski, and suspicion of foul play centered on appellant. Appellant eluded authorities until his arrest on Wednesday, June 2. The Commonwealth's case stressed Klinger's motive, an opportunity to kill his mother, his familiarity with the Lambs Gap area and his week in flight to Maryland and other furtive activity following his mother's disappearance.

The defense's version of the events of May 28 was markedly different. Klinger testified that on that morning, he drove his mother to Millers Gap, a site approximately 3¼ miles distance from Lambs Gap, where appellant sought his mother's help in locating camping equipment that he stated he had left in that location the previous day. According to appellant's testimony, he and his mother separated in an effort to comb the area in search of the equipment. Once appellant realized that he had lost sight of his mother, he testified that he retraced his steps to the car and drove away intending to spend "one last weekend" with Allyson Weiss before he went to jail for a parole violation. He testified that he was certain that she would go to Tillie Miller's home, which was located in Millers Gap.

After leaving Millers Gap, appellant, through a brief detour, proceeded to Lambs Gap Road in order to locate two individuals from whom he intended to buy marijuana. He saw them on the side of the road, waved at them but did not stop as the traffic did not permit him to do so. He then testified that he proceeded from that point directly to the Durkin home.

Klinger stated that when he returned from Maryland on Monday evening, he first learned that his mother was missing and that he was a suspect. He admitted eluding authorities until June 2. He stated that he did this because he had heard the police would shoot him.

The defense focused upon the fact that Klinger's version of the events of May 28 and subsequent period remained consistent from the time of his arrest to the time of trial, and was, in large measure, corroborated by the Commonwealth's witnesses. The defense also attempted to direct suspicion on Robert Pulaski, Klinger's stepfather, by showing that Robert had both a motive and an opportunity to kill the victim. Cross-examination of Robert Pulaski elicited several inconsistencies as to his activities and whereabouts on the morning in question, and these inconsistencies were utilized by the defense in their effort to place blame on Robert Pulaski. It was agreed by both sides that Klinger could have travelled from Camp Hill to either Lambs or Millers Gap and then to Carole Durkin's within the time frame agreed upon. The court's charge to the jury stressed the Commonwealth's burden of proof and mentioned several facts for the jury to consider: whether another person may have been responsible for the death; whether the killing occurred in an area other than where the body was found; the effect of prior consistent and inconsistent statements; and how the jury should construe evidence of motive and flight.

The first argument raised by appellant is that the dismissal of the conspiracy charges against an alleged co-defendant of appellant bars further prosecution of appellant for those charges. In addition to the fact this argument was

not raised either in the trial court or in the appeal to the Superior Court, appellant fails to recognize the limited scope of review accorded in the instant interlocutory appeal. This appeal is before us pursuant to our decision in *Commonwealth v. Bolden*, 472 Pa. 602, 373 A.2d 90 (1977). That decision provided an exception to the general rule that interlocutory appeals will not be entertained. The *Bolden* exception was expressly limited to double jeopardy claims, and our cases have made clear that we will not permit "piggybacking." *Commonwealth v. Klobuchir*, 486 Pa. 241, 248, 405 A.2d 881, 884, n. 5 (1979). Thus, his first argument has been improperly raised at this time and will not be considered.

Turning next to the issue that occasioned the present review, appellant argues that the doctrine of collateral estoppel should be construed as providing an automatic bar to all perjury prosecution which stems from testimony of an acquitted defendant during the substantive trial. In our holding in the companion case, we rejected the concept now being urged. To the contrary, case law has made it clear that where such a claim is raised, the record must be examined to determine whether or not the prerequisites for issue preclusion have been met. *United States v. Sarno, supra; United States v. Venable*, 585 F.2d 71 (3d Cir. 1978); *United States v. Nash, supra*. A blanket prophylactic rule such as the one urged is clearly not constitutionally mandated, *Ashe v. Swenson, supra*, and completely ignores the state's strong interest in ensuring the veracity of sworn testimony given in its courts. *United States v. Sarno, supra; United States v. Fayer*, 573 F.2d 741 (2d Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978); *Adams v. United States*, 287 F.2d 701 (5th Cir. 1961).

It is to be noted that appellant has enmeshed in his collateral estoppel argument contentions that could be properly considered in the perjury trial itself. These considerations are obviously not now germane and will not be

discussed.[12]   We caution, however, that our failure to note these arguments in this opinion is in no way indicative of a qualitative evaluation of their merits in proper context. Insofar as these factors were raised in support of appellant's contention that a prophylactic rule is required, they were considered.   We remain unpersuaded that the accepted rules of collateral estoppel are inadequate to protect against prosecutorial harassment.   We also are of the view that the balance between the competing interest involved in this area is best preserved by the adherence to the existing standard.

Addressing the specific counts approved by the Superior Court for trial, we turn first to Count II.[13]   Count II, in essence, charges that the appellant lied when he stated that he saw and waved to certain acquaintances on Lambs Gap Road on the morning in question and further avers that in fact he did not see them.   Assuming for these purposes that this testimony was material, our examination of the record reveals no basis to justify issue preclusion because of the previous trial.   There is clearly no reason to suggest that the verdict in the murder trial reflected an acceptance of this portion of appellant's testimony.   In discussing this count, the dissent stresses the unlikelihood of a successful prosecution on this ground.   While we are inclined to agree on the record as it presently exists, that fact has no bearing upon the applicability of collateral estoppel.

On the other hand, Count III does present a serious problem, and we agree with appellant that the issue he seeks to foreclose was finally litigated in the prior proceeding.

12. The crime of perjury as defined under the Crimes Code, 18 Pa.C.S.A. § 4902, requires as an essential element the materiality of the alleged false statement.   We also note that the evidence relating to the possibility of prosecutorial vindictiveness may be material to a due process claim but not to the collateral estoppel aspect of double jeopardy. *See, e. g., North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).   Again, it must be emphasized that this is a *Bolden* appeal and the scope of review is narrow.

13. As stated, the Superior Court sustained appellant's objection to Count I and, therefore, that count is not a subject of this appeal. Count IV was dismissed at the preliminary hearing, and that also is not presently under consideration.

That count seeks to establish that appellant lied when he testified that he last saw his mother during the search for his camping equipment. To the contrary, it is contended that he last saw his mother when he struck her. The majority of the Superior Court attempted to avoid the consequences of the collateral estoppel rule by suggesting that although the jury found that he did not cause his mother's death, there was no occasion for them to conclude that appellant did not strike his mother. This reasoning, in our view, is totally unacceptable. Under all of the evidence presented at the first trial, there was indication of only one assault, which was the fatal assault accomplished by one assailant. To suggest that the jury fantasized a second altercation represents the type of rationalization that *Ashe* condemns. We are satisfied that the jury's verdict in the murder trial, finding that appellant did not commit the fatal assault, also included the finding that appellant did not assault her on the morning in question. Thus, a relitigation of that issue would be improper.

As to Count V, our conclusions are substantially the same as those expressed with reference to Count II. Count V charges that appellant lied when he stated the first person he spoke to about the events of the morning in question was a Mr. Nielson. To the contrary, it is stated that he made certain earlier statements to another individual. Here again we cannot say that the jury's verdict of acquittal reasonably reflects that they accepted as true this testimony and, therefore, there is no basis to foreclose the perjury prosecution on this count.[14] So too with Counts VI and VII. Count VI relates to the route taken and Count VII charges a conspiracy between appellant and his trial counsel

14. We note that in the alleged statement to Ms. Guise, Klinger is averred to have stated that he struck his mother and left her on the mountain. The original jury's finding that Klinger did not in fact strike his mother or leave her on the mountain does not preclude a subsequent jury from determining that he may have told someone that he did. The heart of this averment is not the truth or falsity of the content of the statement, but rather whether he discussed the events of that morning with someone prior to his conversation with Neilson.

 

to commit perjury. In each of these instances, there is no basis for finding collateral estoppel to apply.

Accordingly, the Order of the Superior Court affirming the trial court is affirmed as to Counts II, V, VI and VII. The Order is reversed as to Count III, and the appellant is discharged as to Count III.

EAGEN, former C. J., did not participate in the decision of this case.

ROBERTS, Justice.

I agree that the charge of perjury against appellant Manfred Hude must be dismissed. In my judgment, however, all of the perjury charges against Appellant Dennis Klinger should also be dismissed. Fair and even-handed administration of justice compels equal treatment of both Hude and Klinger.

*Klinger Should Also Be Discharged*

The Opinion of Mr. Justice Nix fails to disclose the appalling conduct on the part of the District Attorney of Perry County in bringing the present perjury charges against Klinger. Immediately after the Perry County jury acquitted Klinger of murder, the district attorney publicly stated his disagreement with the jury verdict and announced that he intended to investigate the possibility of retrying Klinger on the murder charge as well as lodging perjury charges against Klinger on the basis of his testimony at the murder trial.

When the Court of Common Pleas of Perry County learned of the prosecutor's intention to file perjury charges, the court requested the prosecuting attorney to submit the perjury case to the Commonwealth's Attorney General for an impartial determination of whether the charges ought to be filed. Deputy Attorney General Bernard L. Siegel reviewed the evidence and recommended that Klinger not be prosecuted.

Nonetheless, the prosecutor sought another opinion from the York County District Attorney who, after review, supported the view of the Perry County District Attorney. Acting on this support, and in total disregard of the recommendation of the Attorney General, the district attorney filed perjury and conspiracy to commit perjury charges against Klinger. Included in the charges which the majority leaves standing are the allegations that: (Count II) Klinger lied when he stated that he saw and waved to "two guys" on Lamb's Gap Road after leaving Miller's Gap; (Count V) Klinger lied when he stated that one Nielson was the first person to whom he related the events of Miller's Gap; and (Count VI) Klinger lied when he detailed the route taken from Camp Hill to the mountain.

The Supreme Court of the United States long has held the view that a prosecutor

"is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a particular and very definite sense the servant of the law . . . . "

*Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), quoted in *Gannett Co. v. DePasquale,* 443 U.S. 368, 384 n. 12, 99 S.Ct. 2898, 2908 n.12, 61 L.Ed.2d 608 (1979). The District Attorney's conduct here falls far below the Supreme Court's standard. His conduct is clearly vindictive and designed to obtain vengeance against Klinger despite the jury's verdict of acquittal on the substantive charges. Indeed, a clearer record of bad faith prosecution could not be established. Here, after openly admitting and publicizing his personal dissatisfaction with the jury's verdict of not guilty on the substantive charge of murder, the Perry County District Attorney has proceeded to bring perjury charges against Klinger in disregard of the opinion of the office of the Attorney General, the highest law enforcement officer of this Commonwealth, that prosecution is

unwarranted. The charges brought are among the most frivolous imaginable, relating to wholly collateral matters in Klinger's testimony such as Klinger's statement that he saw two persons standing on a road the morning of the alleged killing. This testimony can in no way be viewed as material for purposes of a perjury prosecution. See 18 Pa.C.S. § 4902(a) (false testimony must be material). As Judge Hoffman observed in his dissenting opinion in the Superior Court, prosecution on this charge relating to whether Klinger saw and waved to two persons on a road is "childish," to say the least.

It must be clear that the jury which acquitted Klinger on the substantive charge of murder heard and favorably evaluated Klinger's version of the events on the morning of the alleged killing. As Mr. Justice Rehnquist has stated in expressing the opinion of the Supreme Court:

> "[T]he law attaches particular significance to an acquittal. To permit a second trial after an acquittal, however mistaken the acquittal may have been, would present an unacceptably high risk that the Government, with its vastly superior resources, might wear down the defendant so that 'even though innocent, he may be found guilty.' *Green v. United States*, 355 U.S. 184, 188, 78 S.Ct. 221, 223 (1957)."

*United States v. Scott*, 437 U.S. 82, 91, 98 S.Ct. 2187, 2194, 57 L.Ed.2d 65 (1978). See also *Taylor v. Redman*, 500 F.Supp. 453 (D.C., Del. 1980). There is no reason now for the Opinion of Mr. Justice Nix to permit circumvention of the jury's deliberation and conclusion by way of the present frivolous charges, well characterized by Mr. Justice Flaherty as "a vindictive prosecution motivated by vengeance." Indeed, a federal district court recently observed:

> "[I]t would be very unfair to let the Government do indirectly what it cannot [do] directly . . . . A government must, above all, be fair to its citizens."

*United States v. Reed*, 496 F.Supp. 865 (D.C., E.D. Ark. 1980) (barring perjury prosecution based on grand jury testimony denying bribe eight to ten years ago, beyond

statute of limitations). It is fundamental to the integrity of the American system of fair and equal administration of criminal justice that Klinger be granted the same relief as Hude.

O'BRIEN, C. J., joins this Opinion.

FLAHERTY, Justice, concurring and dissenting.

While I join the majority opinion in the Hude Appeal, I dissent regarding appellant Klinger under the circumstances of this case, which clearly demonstrate a vindictive prosecution motivated by vengeance. Were it not for this abuse of the prosecutorial function, I would fully join in the legal analysis well set forth by Mr. Justice Nix.