NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-13                                            Appeals Court

COMMONWEALTH  vs.  MICHAEL FERREIRA.

No. 15-P-13.

Middlesex.     February 2, 2016. - October 14, 2016.

Present:  Vuono, Grainger, & Massing, JJ.


Collateral Estoppel.  Practice, Criminal, Collateral estoppel,
     Dismissal.  Perjury.  Homicide.



     Indictment found and returned in the Superior Court
Department on May 26, 2011.

     A motion to dismiss was heard by Richard T. Tucker, J.


     Robert J. Bender, Assistant District Attorney, for the
Commonwealth.
     Eric R. Wilson for the defendant.


     VUONO, J.  The issue in this case concerns the proper

application of the doctrine of collateral estoppel, as embodied

in the double jeopardy clause of the Fifth Amendment to the

United States Constitution and in Massachusetts statutes and

common law.  See Ashe v. Swenson, 397 U.S. 436 (1970);

Commonwealth v. Benson, 389 Mass. 473 (1983).  See also G. L.

c. 263, § 7; <u>Commonwealth</u> v. <u>Leggett</u>, 82 Mass. App. Ct. 730, 734 (2012).

In 2011, nearly forty-two years after the body of fifteen year old John McCabe was found in a field near the railroad tracks in the city of Lowell, the defendant, Michael Ferreira, and Walter Shelley each were indicted by a grand jury on one count of murder. A third individual, Edward Brown, was indicted on one count of manslaughter.[1] The defendant also was charged with perjury arising from allegedly false testimony he gave on April 16, 2008, before a grand jury investigating the murder, specifically, testimony denying any knowledge of what happened to McCabe.[2] Following a jury trial on the murder indictment at which Brown testified for the Commonwealth pursuant to a cooperation agreement, the defendant was acquitted. In a separate trial, Shelley was convicted of murder in the first degree by extreme atrocity and cruelty.

---

[1] The grand jury returned indictments against Shelley (murder), Brown (manslaughter), and the defendant (perjury) on May 26, 2011. The defendant was indicted for murder on August 12, 2011, after proceedings pursuant to G. L. c. 119, § 72A, were held in the Juvenile Court.

[2] We are unable to determine from the record whether the grand jury that returned the perjury indictment is the same grand jury before which the defendant testified. Given the passage of time between the two events, it is likely that there were two different grand juries. In any event, nothing turns on this issue.

After his acquittal, the defendant moved to dismiss the perjury indictment on the ground of collateral estoppel.  He asserted that the not guilty verdict was based on the jury's rejection of Brown's testimony and claimed that, because the Commonwealth could not prove the perjury charge without presenting Brown's testimony, the Commonwealth is estopped from prosecuting the perjury charge.  In a thoughtful memorandum of decision and order, a Superior Court judge (motion judge), who was not the trial judge, allowed the motion, from which the Commonwealth now appeals.[3]  Because we conclude that the defendant failed to satisfy his burden of showing that collateral estoppel is applicable in the circumstances presented, we reverse the order of dismissal.

Background.  1.  Facts.  The jury could have found the following facts.  On the evening of September 26, 1969, McCabe attended a dance at the Knights of Columbus hall in the town of Tewksbury.  When McCabe failed to return home, his parents contacted the police and drove around town with a police officer looking for him, without success.  The following morning McCabe was found dead in a field off of Maple Street and adjacent to the railroad tracks in Lowell.  He was fully clothed and lying prone on the ground.  His eyes and mouth were covered with

---

[3] The Commonwealth also appeals from the order denying its motion for reconsideration.

adhesive tape, his hands were tied behind his back, and his ankles were tied together with a separate piece of rope. A third piece of rope was wrapped around McCabe's neck and knotted, resulting in ligature furrows that encircled the entire neck. There was conflicting evidence about whether the rope from McCabe's neck had been tied to the rope binding his ankles. Brown testified that McCabe was "hog-tied," meaning that the rope from McCabe's neck was tied to the rope around his ankles such that his legs were up in the air. However, when the body was found, McCabe's legs were straight and the rope that had been tied around his neck was not tied to any other rope. In addition, Dr. Kimberley Springer, a forensic pathologist and medical examiner for the Commonwealth, opined that, while the ligature furrows that appeared around McCabe's neck could be consistent with a rope tied in the manner described by Brown, without more information, she could not be certain how the rope had been tied.[4] The defendant's expert, Dr. Thomas Andrew, did not believe that McCabe had been hog-tied and opined that there was no forensic evidence to support this theory.[5] Despite this

[4] The medical examiner who performed the autopsy was not available at the time of trial. Dr. Springer testified to the cause of death.

[5] At the time of his testimony, Dr. Andrew was chief medical examiner for the State of New Hampshire.

discrepancy, there was no dispute that McCabe died by asphyxiation by strangulation.

The police investigation immediately following the discovery of McCabe's body did not point to any definite suspects. Many witnesses were questioned, including the defendant, who told the police that he saw McCabe on the night in question while he was riding in a car driven by Nancy Williams, to whom he was married at the time of trial.[6] McCabe was on his way to the dance and Nancy, along with the defendant, gave McCabe a short ride. Thereafter, the defendant was with his friend, Shelley. The two visited a friend who was babysitting and, at about 12:15 A.M., the two drove to Lowell to buy cigarettes and beer at a store known as "Cunningham's," which is located near the railroad bridge.

About two weeks after the murder, the defendant stated to friends that he thought the police suspected him of killing McCabe. When his friends asked him why he thought that, the defendant responded, "I did it." He immediately followed with the statement, "[J]ust kidding."

The murder investigation remained open and decades passed without significant developments. Then, in 1997, the defendant attended a pig roast at the home of a childhood friend, Brian

---

[6] Because the defendant's wife changed her surname to Ferreira, we use her first name to avoid confusion.

Gath. Jack Ward, who was a close friend of McCabe's, also attended the party. While there, Ward and the defendant had a conversation about the unsolved murder during which the defendant told Ward that he knew who killed McCabe. The defendant stated that Shelley committed the crime because McCabe was paying too much attention to Shelley's girl friend, thirteen year old Marla Shiner. This information, which was provided to the police at some point in 2002, prompted the police to contact Shiner who was living in California. In a telephone interview, she confirmed that she had been dating Shelley at the time of McCabe's murder. However, when she testified at trial, Shiner claimed that the relationship began some time after the date of the murder. Shiner married Shelley when she turned eighteen. The couple subsequently divorced.

The investigation continued, and on October 30, 2003, the police went to see the defendant at his home in Salem, New Hampshire. Nancy was present as well. During the ensuing interview, the defendant stated that he remembered the events of the night of the murder and then gave a slightly different version of his activities than he had given in 1969. In 2003, he stated that he was with Brown in addition to Shelley on the night McCabe was murdered. He identified Shiner as Shelley's girl friend and said she was with him (the defendant), Shelley, and Brown for part of the evening. The defendant described

Shelley as a jealous boy friend who beat Shiner. The defendant again stated that he went to Cunningham's with Shelley, but this time (in 2003) he said that Brown and Shiner also were present. In response to questions regarding what he told Ward at the pig roast in 1997, the defendant acknowledged that he said Shelley killed McCabe. Upon hearing this, Nancy reacted angrily. The defendant then qualified his response by stating, "I didn't say he did it, I said he probably did it."

A few years later, on April 16, 2008, the defendant testified before a grand jury that was investigating McCabe's murder. During the course of his testimony, the defendant was asked if he knew what happened to McCabe and he answered, "No." He also was asked if he had seen McCabe after the Knights of Columbus dance in Tewksbury, to which the defendant also responded, "No." Finally, the defendant was asked if he had any knowledge of how McCabe was placed at the field off of Maple Street, and the defendant again responded, "No." The perjury indictment is based on the defendant's negative responses to these three questions.

The police also interviewed Brown at various times between the fall of 2007 and March, 2011. Brown consistently denied having any knowledge of the murder until March 9, 2011, when he confessed that he, Shelley, and the defendant kidnapped McCabe, tied him up, and left him in a field in Lowell. As we have

stated, Brown entered into a cooperation agreement with the Commonwealth, which required him to testify truthfully and to plead guilty to manslaughter.  He was promised no jail time in exchange for his cooperation.

Brown then testified at the defendant's murder trial and recounted the events that resulted in McCabe's death in more detail.[7]  Brown, who was seventeen years old in September, 1969, stated that he and the defendant, who was then sixteen years old, were passengers in Shelley's car and had been drinking beer while driving around looking for McCabe.  When they saw him on the street, the defendant forced McCabe into Shelley's car.  As Brown explained it, "[t]he plan was to teach [McCabe] a lesson for messing with Marla."

Shelly parked in a field off of a dirt road beyond the railroad tracks in Lowell.  Brown then pushed McCabe out of the passenger seat after which Shelley and the defendant pushed McCabe to the ground, bound his ankles and wrists with rope, and then hog-tied McCabe by placing a separate piece of rope around McCabe's neck and tying it to the rope that bound McCabe's ankles.  Brown said that McCabe was squirming and that when he tried to speak, Shelley and the defendant taped his mouth closed and then covered his eyes with tape as well.  After telling

---

[7] The defendant successfully had moved to sever the perjury indictment from the murder indictment.

McCabe not to "mess with Marla anymore," the three teenagers left and drove around drinking more beer. Brown recalled that McCabe's legs were up in the air at a ninety-degree angle when they left and they were in the same position when they returned to release McCabe about one hour later.[8]

Brown remained in the car while Shelley and the defendant approached McCabe and discovered that McCabe was dead. Brown described the defendant's demeanor when he returned to the car as "[s]tartled, surprised, [and] scared." The three friends made a promise never to speak about what had happened, a promise they kept for decades.

At the conclusion of the defendant's two-week murder trial, the jury were instructed on three theories of guilt: (1) murder in the first degree by extreme atrocity and cruelty, (2) murder in the second degree, and (3) murder in the second degree committed in the course of a felony, i.e., kidnapping. The jury were not asked to return verdicts on kidnapping or manslaughter. The jury deliberated for more than five hours over the course of two days before returning a general verdict of not guilty.

2. Dismissal of the perjury indictment. As we have noted, the defendant filed a motion to dismiss the perjury indictment,

---

[8] Brown testified that "[b]ecause [McCabe's] punishment should have been known by [then], [they] were going to let him go."

claiming that Brown's testimony was the only direct evidence of the defendant's involvement in the kidnapping and the murder of McCabe and, because the issue of Brown's credibility already had been decided in the defendant's favor, the Commonwealth was estopped from presenting Brown's testimony at the defendant's perjury trial. The Commonwealth acknowledged its intent to present Brown's testimony again, but argued that it could not be estopped from trying the defendant because the perjury charge involves different issues. The Commonwealth also argued that because the jury returned a general verdict, it was not possible to determine whether Brown's testimony had been rejected for lack of credibility and, therefore, collateral estoppel did not apply.[9]

Following a hearing, the motion judge conducted a thorough review of the record and ultimately determined that the Commonwealth was estopped from prosecuting the perjury indictment. He began his analysis with an overview of the doctrine of collateral estoppel. As defined by the United Stated Supreme Court in Ashe, 397 U.S. at 443, the doctrine of collateral estoppel provides that "when an issue of ultimate fact has once been determined by a valid and final judgment,

---

[9] The Commonwealth also claimed below that it had been prejudiced when the defendant's motion to sever the perjury indictment was allowed but does not pursue this argument on appeal.

that issue cannot again be litigated between the same parties in any future lawsuit."  To establish collateral estoppel, the party raising the bar has the burden of providing a "concurrence of three circumstances":  (1) a factual issue common to both prosecutions, (2) "a prior determination of that issue in litigation between the same parties," and (3) a determination in the prior proceeding favorable to "the party seeking to raise the estoppel bar."  Commonwealth v. Coleman, 20 Mass. App. Ct. 541, 547 (1985).[10]  Following Federal precedent, our cases further instruct "that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality," Ashe, supra at 444.  See, e.g., Commonwealth v. Ringuette, 60 Mass. App. Ct. 351, 360-361, S.C., 443 Mass. 1003 (2004).  Finally, where a prior judgment of acquittal was based on a general verdict, as here, we must "examine the record of [the] prior proceeding[s], taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded

_____

[10] The three-part test of Coleman was stated to be a five-factor test in Commonwealth v. Ringuette, 60 Mass. App. Ct. 351, 357, S.C., 443 Mass. 1003 (2004), by the adoption of additional factors, not in contention in the instant inquiry, of whether the party claiming estoppel had the incentive to litigate thoroughly the issue in the first proceeding, and requiring that the applicable law must be identical in both proceedings.

its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." Ashe, supra (citation omitted).

Applying these principles to the question presented, the motion judge concluded that the Commonwealth was not collaterally estopped from pursuing the perjury charge as a result of the acquittals of murder in the first and second degrees. He reasoned that the jury could have believed all of Brown's testimony and acquitted the defendant of murder in the first and second degrees based on a reasonable doubt that the element of intent or malice had been proven because Brown testified that the motive behind the incident was to teach McCabe a lesson, not to kill him. The judge went on to conclude, however, that the acquittal of murder in the second degree based on a theory of felony-murder, with kidnapping as the predicate felony, demonstrated that the jury necessarily rejected Brown's testimony. In the judge's view a rational jury could not have acquitted the defendant of felony-murder in the second degree, individually or as a joint venturer, if Brown's testimony had been deemed credible.[11] Thus, the judge reasoned that because the jury rejected Brown's testimony, the

---

[11] The judge observed: "the jury could not have believed or accepted Brown's testimony and then not found [the defendant] guilty of kidnapping and of a killing occurring during the commission of the kidnapping."

Commonwealth's use of his testimony in the perjury trial would amount to a retrial of the issue already litigated.

We agree with the judge's reasoning insofar as he concluded that the acquittals of murder in the first and second degrees do not bar the Commonwealth from prosecuting the perjury indictment. Our analysis differs, however, on the question whether the acquittal of the charge of felony-murder in the second degree warrants dismissal of the perjury indictment.

Discussion. In Commonwealth v. Benson, 389 Mass. at 478, the Supreme Judicial Court stated that the doctrine of collateral estoppel may work in two ways. "First, it may bar totally a subsequent prosecution if one of the issues necessarily decided at the first trial is an essential element of the alleged crime in the second trial. Second, even if a prosecutor may proceed to a second trial, the doctrine may bar the introduction of certain facts determined in the defendant's favor at the first trial."

We first consider whether the not guilty verdict bars completely the prosecution for perjury. Clearly, it does not. None of the elements of perjury was required to be proved in the murder trial. See Carrasquillo v. Commonwealth, 422 Mass. 1014, 1015 (1996) (where defendant found not guilty of murder, collateral estoppel did not bar subsequent prosecution for conspiracy to commit same murder). More fundamentally, the only

fact determined here in the murder trial was that the defendant did not participate as a principal or as a joint venturer in killing McCabe. That fact is not necessary to prove perjury. The defendant's argument that the Commonwealth cannot prove he committed perjury in 2008 without also proving that he participated in the kidnapping and the murder of McCabe rests on a misreading of the perjury indictment. The indictment specifies that the defendant falsely denied having any knowledge of what happened to McCabe, not that he falsely denied that he was involved in committing the crime of murder. Because the perjury offense is distinct from the murder offense, and does not require the Commonwealth to prove the defendant's involvement in the underlying murder, a subsequent prosecution for perjury does not implicate the doctrine of collateral estoppel.[12]

---

[12] The case of Commonwealth v. Hude, 492 Pa. 600 (1980), upon which the defendant primarily relies, is distinguishable. In that decision, the Supreme Court of Pennsylvania addressed two appeals, both of which raised the issue whether a defendant may be tried for perjury arising out of statements he made in a prior trial in which he was acquitted of the charges brought against him. Id. at 607. In Manfred Hude's appeal, the perjury conviction was reversed because it was based on the same evidence -- the defendant's testimony at trial denying his involvement in the crime -- that was accepted as true in the first trial. Id. at 621. Because the jury already had rejected the Commonwealth's case and had accepted the defendant's testimony, relitigation of the defendant's truthfulness at the perjury trial violated the prohibition against double jeopardy. Ibid. In Dennis Klinger's appeal, there were multiple perjury charges, some of which were based on his testimony at his murder

We now turn to the second question, that is, whether the Commonwealth is estopped from presenting Brown's testimony at the perjury trial because the issue of his credibility has already been litigated. The answer is no. Taking the rational and realistic approach advocated by the United States Supreme Court in Ashe, and in our cases, we conclude that the jury could have believed Brown was telling the truth while acquitting the defendant of felony-murder in the second degree. Regarding felony-murder with kidnapping as the predicate felony, the jury properly were instructed by the trial judge that they were required to find beyond a reasonable doubt that the kidnapping was committed "with a conscious disregard for the risk to human life."[13] The judge further specified: "[t]he felony of kidnapping must have occurred in a way known by the defendant to

---

trial denying culpability and others that were related to his testimony regarding his alibi. Id. at 608-609. The court concluded that the defendant's denying committing the murder could not be the basis for a subsequent perjury charge, but held that the other perjury charges could proceed because the jury's verdict of acquittal did not reasonably reflect that they accepted the truth of the alibi testimony. Id. at 625-627.

[13] The judge instructed the jury in pertinent part as follows: "the Commonwealth must prove to you beyond a reasonable doubt . . . that the killing occurred while the defendant was committing or attempted to commit a kidnapping," that "the killing occurred in connection with the kidnapping and at substantially the same time and place," and that the defendant "committed or attempted to commit the felony of kidnapping with a conscious disregard for the risk to human life."

be dangerous to life or likely to cause death."[14]  Viewing the entire case and all the circumstances, including the age of the defendant at the time of the crime (sixteen years old), the motive behind the kidnapping (to teach McCabe a lesson), the defendant's consumption of alcohol (beer), and the defendant's reaction upon discovering McCabe was dead (startled, surprised, and scared), we are persuaded that the jury could have acquitted the defendant in accordance with the trial judge's instructions by concluding that the defendant was not cognizant of the danger posed to McCabe's life during the kidnapping and therefore did not commit the felony of kidnapping with a conscious disregard for the risk to human life.[15]

---

[14] While conceding the absence of any law in Massachusetts to support his position, the defendant nonetheless urges us to hold that kidnapping is an inherently dangerous felony.  Even if we were inclined to follow the defendant's suggestion, he would fare no better.  There is no doubt that the jury reasonably could have concluded that the defendant committed the kidnapping with a conscious disregard for human life.  However, the point is they were not required to do so on the basis of Brown's testimony.

[15] As we observed in Commonwealth v. Lopez, 80 Mass. App. Ct. 390, 394 n.5 (2011), "[c]onscious disregard demands conduct more dangerous than that required for involuntary manslaughter. Involuntary manslaughter requires wanton or reckless conduct, that is, conduct involving 'a high degree of likelihood that substantial harm will result to another.'  Conduct evincing conscious disregard thus requires more than a mere threat of substantial physical harm; conduct supporting felony-murder liability must pose a foreseeable risk of actual loss of life." Ibid. (citations omitted).

While we cannot determine the basis on which the jury reached their verdict, see Commonwealth v. Benson, 389 Mass. at 481 ("A finding of not guilty at a criminal trial can result from any number of factors having nothing to do with the defendant's actual guilt" [citation omitted]), we can say that, in acquitting the defendant, the jury did not necessarily decide that Brown was not credible.  Because the jury may have reached their decision on an issue other than Brown's credibility, the defendant has not met his burden of proving that the jury necessarily rejected Brown's testimony and, consequently, the Commonwealth is not estopped from calling Brown as a witness in the perjury trial.

Order allowing motion to
  dismiss indictment
  reversed.